BENJAMIN F. POPHAM, ET AL. *v.* CONSERVATION COMMISSION, DEPARTMENT OF TIDE-WATER FISHERIES, ET AL.

[No. 67, October Term, 1945.]

*Decided March 13, 1946.*

64

The cause was argued before MARBURY, C. J., DELA-
PLAINE, GRASON, HENDERSON, and MARKELL, JJ.

*Emanuel Klawans* and *Wilbur R. Dulin* for the appellants.

*T. Barton Harrington, Assistant Attorney General,* with whom were *William Curran, Attorney General,* and *Marvin I. Anderson, State's Attorney for Anne Arundel County,* on the brief, for the appellees.

GRASON, J., delivered the opinion of the Court.

On February 27, 1945, Samuel J. Carr, a resident of Edgewater, Maryland, filed an application for lease of a certain area with the Department of Tidewater Fisheries of the State of Maryland (herein referred to as Department). This area comprised eight acres of ground located in the Rhode River and in proximity of High Island, in the waters of Anne Arundel County, which area was marked by placing thereon not less than four stakes bearing Carr's name. This application was duly published, warning any persons who desired to do so to file protests against leasing this area within thirty days from March 22, 1945. Thereafter, within the time limited by the advertisement, Benjamin F. Popham, George T. Gardner and Allen Dawson filed a protest in the Circuit Court for Anne Arundel County against leasing this area, alleging that they are residents of Anne Arundel County, Maryland, and asserting: (1) That the said ground is a natural oyster rock or bed; (2) that the said ground is classified by the Department as a natural

bar or bed; (3) that the application is null and void because the procedure required by law was not followed; (4) and for other reasons to be shown at the hearing.

An answer was filed to this protest by the gentlemen constituting the Conservation Commission Department of Tidewater Fisheries: (1) Neither admitting nor denying that the petitioners are residents of Anne Arundel County; (2) denying the allegation in paragraph one of the protest; (3) denying the allegation in paragraph two of the protest; (4) denying the allegation in paragraph three of the protest and asserting that the procedure required by law was strictly followed; (5) asserting that the ground described in the petition was classified in 1906 as a natural oyster bar, but that, in conformity with the law, it was resurveyed and reclassified by agents of the Department on February 27, 1945, and determined to be a barren bottom; "that the charts required to be filed by law in the office of the Clerk of the Circuit Court for Anne Arundel County have not yet been filed, as a period of ninety days has not elapsed between the time of the survey and the time permitted by law in which said amendments may be filed with the Clerk." Answer was also filed by Carr, which need not be set out.

On March 27, 1945, Charles Witt, a resident of this State, filed an application with the Department to lease seven acres of ground located under the waters of the State of Maryland, which area had been marked by placing four stakes at the respective corners thereof, bearing the name of Witt, the area being described as: "located in Rhode River, northerly and abreast of Locust Point; in the waters of Anne Arundel County." This application for lease was duly published, warning any who desired to protest to file their protest in the Circuit Court for Anne Arundel County within ninety days from April 19, 1945. The same gentlemen who protested in Carr's case protested in Witt's case, and for the same identical reasons asserted in Carr's case. The Department's answer is identical with the answer filed in Carr's

case. Witt also filed an answer, which we need not set out.

In this state of the matter the law required the clerk to docket a suit at law in which the protestants are plaintiffs and the Department is the defendant, and the judge to pass an order directing summons to issue for the defendant as is required in actions at law, returnable to a day named in the order. The hearing on the matter in the Circuit Court shall be before a jury, unless a jury trial be waived by the parties, in which event the hearing shall be before any judge or judges of said court with an appeal to this Court from a judgment rendered below within ninety days thereafter, in which event this Court shall have power to review all questions of fact or law involved. Acts of 1945, Ch. 929, Sec. 12 (j).

A jury trial was waived and these cases were heard together by the court, without the aid of a jury. They were heard by the court on May 15, 1945, at which time Article 72, Flack's Code, 1939, and amendments thereto were in effect. The judgment in each case was rendered on June 14, 1945. Between the time these cases were heard by the court and the rendition of the judgments therein, the Legislature passed the Act of 1945, Chapter 929, effective June 1, 1945, changing, in certain respects, the provisions of Article 72. In this situation the Act of 1945, Chapter 929, superseded Article 72 in so far as it amended same, and its provisions governed and controlled the cases at bar as the existing law. *Munroe v. Wells*, 83 Md. 505, 35 A. 142; *Meloy v. Scott*, 83 Md. 375, 376, 35 A. 20; *Turner v. Bryan*, 83 Md. 373, 374, 35 A. 21; *State of Md. v. American Bonding Co. et al.*, 128 Md. 268, 97 A. 529; *Day v. Day*, 22 Md. 530; *Wade et al. v. St. Mary's Industrial School*, 43 Md. 178; *Chesapeake & O. Canal Co. v. Western Maryland R. Co.*, 99 Md. 570, 58 A. 34; *Cocherham et ux. v. Children's Aid Society of Cecil Co.*, 185 Md. 97, 43 A. 2d 197.

Thereafter there was filed, in each case, a motion to strike out the respective judgments, which, after hear-

ing thereon, were overruled and the judge below wrote an opinion in the cases, wherein he considered the law as changed by the Act of 1945 and came to the conclusion that the applications should be granted. Thus the lower court applied the current law to the facts of the cases. The court then amended its judgment in each case by striking therefrom the words "or bed within the purview and meaning of Section 93 of Article 72 of Flack's Annotated Code of Public General Laws of Maryland, title 'Oysters,' sub-title 'Oyster Culture'." This action was taken on July 12, 1945, from which action an appeal was taken in each case. By these judgments the court held that the areas in question were not natural bars at the time of the entry of the judgments.

The appellants, in their brief, contend that the decision to reclassify the areas from natural beds to barren bottoms is illegal; that receiving applications for leases of areas while the public records still show them as natural beds, excluded from leasing, is invalid procedure; that the applications and public notice are insufficient in the description of the areas to be leased; and that the statutory requirement that a copy of the chart be filed in the Circuit Court for Anne Arundel County has not been complied with. The only question pressed in argument before this Court was the authority of the Department to declare an area to be a barren bottom, and if so found, the power of the Department to lease the same. The other points referred to were not pressed in argument before this Court, and need not be considered, except to say that we have reviewed the same and think that the court below was correct in its conclusions thereon.

It is the contention of appellants that the General Assembly of Maryland has not empowered the Department to lease a depleted oyster bed or bar, although the facts show, at a given date, it is a barren bottom. Appellees challenge this contention, and assert the Department has such power and the courts can review its finding, and

the finding of a court is final. Appellants assert that the word "resurvey," contained in Section 12 (c), Acts of 1945, Chapter 929, is intended to limit the Department to the determination of the actual area of a natural bar. The word "resurvey," it is contended, does not give the Department power to reclassify a bar heretofore classified as a natural bar, and to determine that at a given time it has ceased to be such and has become a barren bottom. The contention is that once a natural bar always a natural bar, notwithstanding a given area has become so depleted that no oysters can be found thereon.

Appellees assert that the word "resurvey" was not intended by the Legislature to have such a restricted meaning. They say that the word in the Act means that the Department has power to determine as a fact whether such an area heretofore classified as a natural bar is a barren bottom.

Section 86 of Chapter 711 of the Acts of 1906 required the Board of Shell Fish Commissioners (the predecessor of the Conservation Commission of Department of Tidewater Fisheries) to make an actual survey of the natural beds of the State and to delineate the boundaries thereof on maps and charts, and to cause one copy of each to be filed with the Clerk of the Circuit Court of the appropriate county. And Section 89 of that Act required the Board to conduct a survey with the assistance of the U. S. Coast and Geodetic Survey and the U. S. Fish Commission. The Board was required to make a written report and cause it to be published in pamphlet form, and to file a copy thereof with the clerk of the appropriate Circuit Court where the particular map or chart was filed. This survey was completed and charts and reports were published and filed.

Section 119 of that Act required the old Board of Shell Fish Commissioners to prepare an annual report of its activities and to present it to the General Assembly. All ground not delineated on the map as a natural bar could

be leased. This Act did not contemplate any change of areas delineated as natural bars on the map directed to be made. It was found that the map prepared and filed under the provision of this Act did not include all of the natural bars in the waters of the State, and one of the reasons for the passage of the Act of 1914, Chapter 265, was to correct this situation. That Act provided, in Section 83: "The term 'natural beds or bars' wherever used in this Act shall hereafter be construed to mean and include all oyster beds and bars under any of the waters of this State whereon the natural growth of oysters is of such abundance that the public have successfully resorted to such beds or bars for a livelihood, whether continuously or at intervals, during any oyster season within five years prior to the time of filing of the application for a lease of the area in question, or if no application has been made for a lease of the area in question, then within five years prior to the making of the resurvey under Section 94-A, or the filing of a petition under Section 94-B of this Act, provided that the actual condition of the area in question at any time within said respective periods of five years or up to the date of hearing shall be taken into consideration in determining whether or not said area is a natural bed or bar, as above defined."

Section 103 of that Act provided for the publication of the application for lease. These sections of that Act were codified in the Codes of 1912, 1924 and 1939. The contemporaneous construction of the old Board of Shell Fish Commissioners was that it had power under the Act of 1914 to re-examine and reclassify at any time, upon its own initiative, any land, natural or barren, except leased land.

"The provision giving the Shell Fish Commissioners full initiative to make new surveys at any time, coupled with the provisions requiring advertisement of each application and an opportunity for judicial classification, practically wipes out the old survey. * * * The old

charts and the old boundary lines remain, it is true, but they are subject to change either by throwing new areas open to lease or including new areas within the natural-bar territory at any time, and no area can be leased until the application has been advertised and an opportunity for judicial classification given. As an actual matter of fact any citizen of Maryland may today apply for a lease of any land underlying the waters of the Chesapeake Bay and its tributaries without regard to any previous survey. If it has been previously classified as natural bar the Commission may re-examine it, and if it concludes that it is now depleted, modify the charts and advertise the application." "Seventh Report" of the Shell Fish Commissioners, 1914 and 1915, dated January 11, 1916.

This report was presented to the General Assembly as required by Section 119, Chapter 711, of the Acts of 1906. Flack's Code, 1939, Art. 72, Sec. 136. See Third (1925), Sixth (1928) and Seventh (1929) Annual Reports of the Conservation Department.

Attorney General Armstrong, in 1922, said: "I think also that the definition noted above contemplates that a bottom natural in one year might not be natural in another year. If, for instance, the last successful resort to a given bar for a livelihood was in the oyster season of 1916, such a bar would be held in 1921 to be a natural bar, but in 1922 barren. Section 96A also contemplates a resurvey at any time. The obvious purpose is to keep the charts showing the natural bars accurate indications of the real character of the bottom." 7 *Report and Official Opinions of Attorney General*, page 61.

On May 4, 1928, Attorney General Robinson said: "I am, therefore, of the opinion that you may resurvey any area in the bay or its tributaries, and if you find the facts warrant it, may open for lease the portions thereof now classified as natural bars, but which are in fact barren bottoms, thus showing that the natural bars are

in fact now not correctly located on the charts." 13 *Report and Official Opinions of Attorney General*, page 60.

It thus appears that the old Board of Shell Fish Commissioners and its successor have construed the Act of 1914, Chapter 265, as conferring the right on the old Board of Shell Fish Commissioners, now the Conservation Commission of the Department of Tidewater Fisheries, to reclassify what has been delineated on the official chart as a natural bar, a barren bottom. This construction is given greater force because of the opinions of the Attorney Generals and the fact that the reports of the old Board of Shell Fish Commissioners and its successor have, from time to time, been made to the Legislature and that body has not seen fit to interfere with such construction by annulling it through legislation. This contemporaneous construction, long continued under such circumstances, has the force of law. *Arnreich v. State*, 150 Md. 91, 132 A. 430; *Bouse v. Hutzler*, 180 Md. 682, 26 A. 2d 757, 141 A. L. R. 843; *American-Stewart Distillery, Inc. v. Stewart Distilling Co.*, 168 Md. 212, 177 A. 473; *Baltimore City v. Johnson*, 96 Md. 737, 743, 54 A. 646, 61 L. R. A. 568; *Mayor & City Council of Baltimore v. Machen*, 132 Md. 618, 624, 104 A. 175; *Burroughs Adding Machine Co. v. State*, 146 Md. 192, at page 198, 126 A. 127; *United States v. American Trucking As'n*, 310 U. S. 534, 60 S. Ct. 1059, 84 L. Ed. 1345; *Read Drug & Chemical Co. v. Claypoole*, 165 Md. 250, at page 257, 166 A. 742; *Leitch v. Gaither*, 151 Md. 167, at page 176, 134 A. 317.

In this case appellants urge that the word "resurvey" should be given a limited and restricted meaning and that it was not intended to confer power upon the Department to reclassify what was before a natural bar as a barren bottom. The contemporaneous construction of the word "resurvey," used in the statue, followed throughout the years by the officials, apparently acquiesced in by the Legislature, will, under the circumstances of this case, be regarded as established law that the

Department had the right to determine at a given time whether a bar theretofore classified as natural is in fact a barren bottom, and if so it might, in accordance with the provisions of law, be leased by the Department to an individual for the purpose of planting and cultivating oysters thereon. We think this is the correct construction of the law existing before the Act of 1945, Chapter 929.

Does the Act of 1945, Chapter 929, change the law as we have found it to be prior to its passage? It is contended that the word "resurvey," as found in that Act, should not be given the same construction which we have given it prior to the enactment of the Act of 1945, Chapter 929. The Act of 1906, Sections 86 and 89, required "a true and accurate survey of the natural beds be made." The Act of 1914, Chapter 265, Section 98, provided as follows: "After the survey or resurvey provided for herein shall have been completed, it shall be the duty of the Board of Shell Fish Commissioners to lease, in the name of the State of Maryland, tracts or parcels of land beneath the waters of this State, whether within the limits of the counties or elsewhere, in the area to be opened for oyster culture, according to the provisions of this Act."

Section 94-A of that Act provides that the Board of Shell Fish Commissioners may at any time resurvey and re-examine areas of the Chesapeake Bay and its tributaries for the purpose of correcting surveys theretofore made by them, and if upon such resurvey the Board shall find that natural beds or bars have been incorrectly located they shall prepare a revised or amended chart showing the natural beds or bars thus resurveyed.

Section 94-B provides that three or more residents of the State may at any time before January 1, 1915, file a petition in writing that certain areas are natural bars and have been excluded from the survey or resurvey of natural bars, and provides for a hearing before a Circuit Court and that the court shall decide whether the

area described in the petition is or not a natural bar as defined by Section 83 of that Act, with a right of appeal to this Court. If the final decision is that the area in question is a natural bar, amended maps shall be made and filed.

Section 12 (c) of Chapter 929 of the Act of 1945 requires the Department to make a resurvey of natural oyster beds. In so doing, the Department must show on its charts: "The correct location and bounds of all natural oyster bars * * * then existing in the area being surveyed." We think the authority conferred upon the Court by Section 94-B of the Acts of 1914, Chapter 265, to determine whether or not a given area was a natural bar, also conferred upon it the power to determine that it was not a natural bar, but a barren bottom, and that the words in Section 94-A, that the Board of Shell Fish Commissioners shall "resurvey and reexamine" such area, meant that it was to determine as a matter of fact whether an area was a natural bar or barren bottom. And the court hearing such a case was to determine the same question of fact, and if the Commissioners were affirmed by the court in their reclassification of a given area, the official chart should be marked accordingly. Again, we think that the words used in Section 12 (c) of the Acts of 1945, Chapter 929, that upon a resurvey the Department must show "the correct location and bounds of all natural oyster bars * * * *then existing* in the area being surveyed" mean that if it found an area theretofore classified as a natural bar, at the time of the survey is in fact a barren bottom, the official chart would be corrected accordingly, and the area then being a barren bottom would be opened to lease by one applying therefor to the Board. Prior to the Act of 1914 there was no definition of a "natural bar." That Act, by Section 83, defined a natural bar, as we have heretofore observed.

The Act of 1906, Chapter 711, did not define a natural bar. The old Board of Shell Fish Commissioners fol-

lowed the standard of a natural bar as defined by Judge Goldsborough, in the Circuit Court for Dorchester County, in the case of *Windsor and Todd v. Moore,* in 1881. That opinion, in part, said:

"There are large and numerous tracts where oysters of natural growth may be found in moderate numbers, but not in quantities sufficient to make it profitable to catch them; and yet where oysters may be successfully planted and propagated. In my opinion, these cannot be called natural bars or beds of oysters, within the meaning of the Act of Assembly, and it is just such lands as these that the State meant to allow to be taken up under the provisions of the above mentioned section of the Act.

"But there is still another class of lands where oysters grow naturally and in large quantities, and to which the public are now and have been for many years in the habit of resorting with a view to earning a livelihood by catching this natural growth; and here, I think, is the true test of the whole question. Land cannot be said to be a natural oyster bar or bed merely because oysters are scattered here and there upon it, and because if planted they will readily live and thrive there; but whenever the natural growth is so thick and abundant and that the public resort to it for a livelihood, it is a natural oyster bar or bed, and comes within the above quoted restriction in the law, and cannot be located or appropriated by any individual."

We think that the failure to classify a natural bar in the current Act results in restoring the definition of Judge Goldsborough, and when such a question arises his definition of a natural bar may be resorted to by the Department for guidance in determining the matter. It was followed before the Act of 1914 by the old Board of Shell Fish Commissioners. The lower court applied the definition of a natural bar as defined by the Act of 1914, and as codified in Article 72, Section 93, Flack's Code, 1939, which is substantially Judge Goldsborough's definition.

Without a full analysis of the testimony, it is sufficient to say that the areas in question were so depleted that the public did not resort thereto for the purpose of gaining a livelihood. In the last five years a few people have taken a few oysters from these bars, but the quantity of oysters taken was small, and no catch could be made in quantities that would afford one a livelihood. Oystermen passed these bars and went out into the bay and worked beds where they could tong oysters in quantities. Some of these men who caught oysters out in the bay brought them in and stored them on the bars in question. This was for the purpose of holding these oysters until they could be sold for a higher price, when they would be taken up and sold. These men really used these bars as storehouses for oysters they caught out in the bay. It is hard to believe that one would store oysters on these bars if they contained oysters of natural growth in such quantities that the public would resort thereto for the purpose of gaining a livelihood, because if such were the case, the stored oysters would be taken along with the oysters grown naturally on the bars.

Most of the witnesses adduced by the protestants believed in the idea, once a natural bar always a natural bar, notwithstanding that a natural bar may become a barren bottom. Appellants contend that the examination made by the engineer of the Department, to determine whether the bars were barren bottom, was not a fair examination because the applicants assisted in this examination. But the examination was conducted by the engineer of the Department, assisted by Captain Hartge, deputy commander of the police boat of the Department, and we think that the testimony shows that the examination was fairly conducted. As this disposes of these cases, it will not be necessary to consider other matters raised by the appellees.

*Judgment affirmed, with costs.*