## DEPARTMENT OF TIDEWATER FISHERIES *v.* CATLIN ET AL.

[No. 45, October Term, 1950.]

*Decided December 6, 1950.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON and MAR-KELL, JJ.

*Ward B. Coe, Jr.,* Assistant Attorney General and *Prentiss W. Evans,* with whom was *Hall Hammond,* Attorney General, on the brief, for appellant.

No brief and no appearance for appellees. *L. Creston Beauchamp* on the Joint Appendix.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a judgment declaring a certain submerged area in Tangier Sound, leased to Norman Bradshaw, to be "a natural oyster bar", and in favor of the appellees for costs.

Code, 1947 Supplement, Article 72, Section 12(a), authorizes The Department of Tidewater Fisheries "to lease in the name of the State of Maryland, tracts or parcels of land to be used for protecting, sewing, bedding or cultivating oysters or other shell fish beneath the waters of this State", subject to certain limitations and restrictions. Among other restrictions, no lease

shall be granted for any natural oyster bar or for any area within fifty yards of any natural oyster bar in the Chesapeake Bay. Under the provisions of Section 12(a), *supra,* The Department of Tidewater Fisheries leased a certain area to Norman Bradshaw, a resident of Smith's Island, Somerset County. Bradshaw's application for lease was duly advertised by the appellants on March 17, 1950, under the provisions of Article 72, *supra,* Section 12(i). After this application was advertised, a protest was filed by the appellees in the Circuit Court for Somerset County under the provisions of Article 72, *supra,* Section 12 (j). This protest was answered by the appellants and the case tried before a jury on certain agreed issues of fact.

The trial judge instructed the jury that, if the evidence did not disclose that the area in question was a natural oyster bar, there was no evidence to show that the land sought to be leased is within fifty yards of any other oyster bar. There was no objection by the appellees to this instruction. Rules of Practice and Procedure, Part Three, III, Trials, Rule 6(d). In fact appellees' attorney stated that he took no exception to the charge. Therefore, the only issue with which we are concerned in this Court is whether the area described in the advertisement in this case is a natural oyster bar.

For the purposes of this case, the definition of a natural oyster bar is that defined by Chapter 284, as amended by Chapter 604, Section 1(i) of the Acts of 1947, codified in the Code 1947 Supplement, Article 72, Section 1(i), which reads as follows: "A natural oyster bar shall also be construed to mean and include all oyster beds and bars under any of the waters of this State whereon the natural growth of oysters is of such abundance that the public have resorted to such beds or bars for a livelihood, whether continuously or at intervals, during any oyster season within five years prior to the filing of any application for a lease of the area in question, or within five years prior to the making of a resurvey under Section 12, provided that the actual condition of the

area in question at any time within said respective five-year periods shall be taken into consideration in determining whether or not said area is a natural oyster bar." This definition is essentially the same as the so-called Goldsborough Rule, which was first given by Judge Goldsborough in the case of *William T. Winder et al. v. Job T. Moore*, in the Circuit Court for Dorchester County, No. 11 Appeals, July Term, 1881. This Goldsborough definition has been in effect by legislation and by judicial decision at various times since. At the time of the decision in the case of *Popham v. Conservation Commission*, 186 Md. 62, 46 A. 2d 184, 189, decided March 13, 1946, a different definition of a natural oyster bar had been adopted by the legislature by Chapter 929, Section 1(i) of the Acts of 1945. However, the legislature in effect substantially readopted this definition by Chapters 284 and 604, of the Acts of 1947, *supra,* Code Article 72, Section 1(i), *supra.* In the case of *Popham v. Conservation Commission, supra,* this Court quoted with approval the following from Judge Goldsborough's opinion: "Land cannot be said to be a natural oyster bar or bed merely because oysters are scattered here and there upon it, and because, if planted they will readily live and thrive there; but whenever the natural growth is so thick and abundant that the public resort to it for a livelihood, it is a natural oyster bar or bed, and comes within the above quoted restriction in the law, and cannot be located or appropriated by any individual."

At the close of the testimony appellants offered a prayer for a directed verdict on the ground that there was no legally sufficient evidence for the jury to find that the area in question was a natural oyster bar. The trial judge reserved his ruling on this prayer. After the verdict, a motion for a judgment N.O.V. was made by the appellants, and overruled. Among other contentions, appellants contend that this motion N.O.V. should have been granted and we will first consider that question. Of course, in deciding whether a judgment N.O.V. should have been granted, this Court should resolve all

conflicts in the evidence in favor of .the plaintiff and should assume the truth of all evidence and all inferences which may be naturally and legitimately deduced therefrom which tend to support the appellee's claim. *Armiger v. Baltimore Transit Co.*, 173 Md. 416, 425, 426, 196 A. 111; *Baltimore Transit Co. v. Worth*, 188 Md. 119, 122, 123, 52 A. 2d 249, 5 A. L. R. 2d 740; *Kuhn v. Carlin*, 196 Md. 318, 76 A. 2d 345, No. 24 This Term. We will therefore examine the evidence of plaintiffs' witnesses in a light most favorable to the plaintiffs on the question as to whether there was any evidence legally sufficient to support the appellees' claim that the area in question was a natural oyster bar as defined by Article 72, Section 1(i), *supra.*.

The lot leased to Norman Bradshaw, as described in his application and advertisement is "an approximate rectangle about 1740 ft. x 600 feet, the long sides of which run on course S 37d. 00′ W true, containing about 25 acres. The northwesterly corner is marked by a stake bearing Applicant's name which bears N 74 d. 15′ E true 5620 from Black Beacon at entrance to Smith Island Thoroughfare Channel. All courses and distances are approximate." This is shown as Lot 21 on a plat filed in the case. To the east of Bradshaw's lot and twelve other lots is a hatched area called "State Shells" which adjoins a hatched area called "Ditch Bank". To the west of Bradshaw's lot is a planted area called "State Plantings". These three areas comprise natural oyster bars upon which the State has planted seed oysters and oyster shells for the use of the public and are the only three areas in that general vicinity where the State has planted oysters and oyster shells. To the southwest of State Plantings is a beacon called "Black Beacon".

Captain Asa Crockett, one of the appellees, on cross-examination admitted the oysters he had caught were on Ditch Bank and State shell plantings. He admitted he did not go anywhere else to catch oysters. Mr. Allan Parks testified that he caught oysters nowhere else except on Ditch Bank and State shell plantings. He said

he and other people had caught oysters on places where the State had planted them, but he could not specify the area. He said he did not catch any substantial number of oysters any other place in that general vicinity except on State shell plantings and Ditch Bank and that is where he caught most of his oysters. He did not say that he had ever oystered on Lot 21 nor had he seen others oyster there. Mr. George Todd said he had caught oysters where the State planted them. On cross-examination he admitted that he never caught any oysters in that general area except on Ditch Bank and the State plantings. Mr. West Cox said he oystered in this vicinity in the fall of 1948 when the State opened its seed area. He said the only place he had oystered was where the State planted oysters and oyster shells and he did not work any other place. Mr. Arthur Nelson admitted on cross-examination that the only place he had oystered in this general vicinity was where the State planted oysters and oyster shells. Mr. Wells Somers, one of the appellees, stated on direct examination that the only place he caught oysters or tried to catch them was where the State had planted oysters and shells. He said he thought the area leased to Bradshaw was a very good bottom and that any bottom which will grow oysters is not a barren bottom. He further defined a barren bottom as "a sandbar-shifting sand. That is what I would term a barren bottom." Mr. Henry Riggin testified that he had caught his oysters and had seen other people oystering where the State oysters and oyster shells were planted and that he oystered nowhere else. Mr. Roy Daugherty testified that he had oystered and seen others oystering in 1948 in this general vicinity but as far as he knew it was a place where the State had planted oysters. Mr. Arthur Daniel said he had been employed by the State in planting oysters in that general vicinity in 1948 and 1949 near the Black Beacon. He could not say how far he went from the Black Beacon in planting oysters and he could not say he had planted oysters on Lot 21, here in question. He also said he was

operating under the direction of The Department of Tidewater Fisheries at that time. Mr. Clifton Webster stated that he was also employed in 1948 and 1949 by The Tidewater Fisheries Commission to plant oysters "over by Smith's Island in the vicinity of the Black Beacon". He was not definite in his testimony as to how far he planted the oysters from the Black Beacon and did not say he planted them on Lot 21 here in question.

Mr. Daniel Dize, a witness offered by the appellees, testified that he went out in a boat with others sometime after the application had been advertised and located certain markers. He said he had seen people oystering out there but that he is a dredger and dredging is unlawful in Tangier Sound. He did not state in what quantities others had caught oysters. He did not say that he himself had oystered in that area. He said also that the oysters are few and scattered in that area. He further said that he saw Norman Bradshaw's name on markers and that was the bottom on which he had seen people oystering and he had planted oysters there himself and reaped the benefit of them. In other words, he ties in Norman Bradshaw's lot with the place on which he himself had planted oysters at a time when they were bringing from $3.00 to $3.50 per bushel and he was only offered seventy-five cents for them. Instead of selling them, he planted them. He said he threw the oysters "on the inside of where the State planted the shells and oysters". Later, other people got part of them. Plainly, therefore, he does not tie in his testimony with the Norman Bradshaw Lot here in question. Otis Tyler, who went with Mr. Dize to locate the markers, after the application was filed, also said he was a dredger and not allowed to dredge in the vicinity in question. He did not testify as to any markers containing Norman Bradshaw's name. His testimony is therefore not material to the oyster bottom here in question. When asked whether he recalled the names of any vessels or captains who had been catching oysters on the area

in question in the last five years, he said he did recall the names of vessels and captains who had been oystering on Ditch Bank, but he did not recall the names of boats or captains who had oystered where the stakes were planted because "we were not around that place".

Chapter 284 of the Acts of 1947, *supra,* was an emergency measure approved April 2, 1947. The definition of a natural oyster bar was the same as that provided in Code 1947 Supplement, Article 72, Section 1 (i), *supra,* with the exception of the proviso in the latter part of that definition, which read: "Provided that the actual condition of the area in question *at any time within said respective periods of five years or up to the date of the hearing of* shall be taken into consideration in determining whether or not said area is a natural bed or bar, as herein defined." (Italics supplied.) Chapter 284 was superseded by Chapter 604 of the Acts of 1947 which was approved April 25, 1947, and effective June 1st, 1947. That definition which is exactly the same as that set out in Article 72, Section 1 (i), *supra,* has a proviso which reads as above stated: "provided that the actual condition of the area in question *at any time within said respective five-year periods* shall be taken into consideration in determining whether or not said area is a natural oyster bar." (Italics supplied.) The period designated in the former part of the definition of a natural oyster bar, *supra,* now in effect provides: "During any oyster season *within five years prior to the filing of any application for a lease* of any area in question." (Italics supplied.) As the words *"up to the date of the hearing"* are omitted from the now effective definition, it is evident that the legislature intended that the evidence as to whether "the public had resorted to such bed or bar for a livelihood, whether continuously or at intervals", was restricted to a period within five years prior to the date of the filing of the application. The effect of the repeal of the proviso in Chapter 284, supra, and the enactment of the new proviso in Chapter 604, *supra,* is a clear expression of the legislative intention that the proviso in

Chapter 604 should remain in effect. *Rosenburg v. Bouse,* 172 Md. 530, 534, 192 A. 323.

The remaining evidence offered by the appellees was testimony as to conditions after the application had been advertised and during the actual hearing of the case in the lower court. On one morning during the trial below, Elmer Evans, Edward Jones, Edward Harrison, Daniel Harrison, Filmore Brimer and Henry Evans were coming from Smith's Island to testify in this case and brought a thirty-six inch dredge with them. They lowered the dredge in the water and "made five hauls". They circled around the buoys of A. R. Marshall, M. Smith, P. Snead, W. Evans and N. T. Tyler and caught almost a bushel of oysters, which they produced in court. There is no testimony that this quantity of oysters was of such an amount as to justify the public in resorting thereto for a livelihood. As this testimony, to which appellants objected, did not show the condition of the oyster bottom within five years prior to the filing of the application it was not admissible, and even if it were admissible there is no evidence that they caught any oysters or went over the lot of Norman Bradshaw, which is the lot here in question and where dredging is not permitted.

It is clear from the testimony in this case that there was no evidence and no inferences which could naturally and legitimately be deduced therefrom which tended to support the appellees' claim that the lot leased to Norman Bradshaw by the appellants was one whereon the natural growth of oysters was of such abundance that the public had resorted to this bed for a livelihood either continuously or at intervals during any oyster season within five years previous to the filing of Norman Bradshaw's application for a lease of the area in question. Therefore, the demurrer prayer of the appellants and the motion N.O.V. should have been granted. For that reason we will reverse the judgment.

In view of this ruling it is not necessary that we pass upon other matters argued which included the question whether, under the provisions of Code, Article 72, Sec-

tion 12(j), 1947 Supplement, this Court has express power to review questions of fact without distinction between cases tried with or without a jury; and appellants' seventh prayer.

> *Judgment reversed, and judgment entered that the area in question in this case is not a natural oyster bar, costs to be paid by the appellees.*