PICKFORD *v.* KOENEMAN ET AL.

[No. 388, September Term, 1970.]

*Decided May 11, 1971.*

The cause was submitted on brief to HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ.

Submitted by *Sidney S. Campen, Jr.,* and *Constable, Alexander & Daneker* for appellant.

No brief filed on behalf of appellees.

SMITH, J., delivered the opinion of the Court.

Professor Garrett Power in his article entitled *More About Oysters Than You Wanted To Know,* 30 Md.L. Rev. 199 (1970), said:

> "Opposition to private oyster leases continues unabated. * * * Furthermore, the opposition to private leasing has a new impetus. Since 1945, natural clam and crab beds have been explicitly exempted from leasing. In the early 1950's, Fletcher Hanks of Easton, Maryland, developed a hydraulic clam rig which made the taking of soft-shelled clams efficient. The result has been a marriage of convenience between strange bedfellows. Clammers and public oystermen are natural rivals since they compete for much of the same bottom, but they have a common interest in preventing the development of an expansive private oyster culture. Hence clammers have joined in the fight against private leasing and, according to one authority, had managed to become the primary force behind such opposition by 1964." *Id.* at 215.

This case is a part of that battle and that "marriage of convenience". We shall be obliged to reverse the action of a trial judge who found upon the basis of protests by clammers that an area might not be leased for a private oyster bed.

Code (1970 Repl. Vol.) Art. 66C, § 708 (a) grants authority to the Department of Tidewater Fisheries to lease in the name of the State "tracts or parcels of land to be used for protecting, sowing, bedding or cultivating oysters or other· shell fish beneath the waters of this State, subject to the provisions, limitations and restric-

tions" set forth in § 708. Section 708 (b) then provides in pertinent part:

> "No lease shall be granted for any * * * clam bed as defined by the charts or amended charts of the Oyster Survey of 1906 to 1912 on file in the offices of the Department of Tidewater Fisheries." [1]

As Professor Power indicates in his article, the 1906-1912 survey came about through the efforts of a Maryland lawyer who advocated a new system for more extensive cultivation of barren bottoms, being concerned with the extent to which even at that time the catch of oysters had declined drastically from the historic highs of the 1880's.

Section 708 (c) makes provision for resurveys of State waters. The Department of Chesapeake Bay Affairs (the Department) is authorized at any time to "resurvey any of the submerged areas of this State for the purpose of determining the position and extent of any natural oyster bars, clam beds, or crab beds". It is directed to amend its charts to reflect the results of such survey. That subsection defines:

> "[A] natural oyster or natural clam bar [as] mean[ing] and includ[ing] all oyster or clam beds or bars under any of the waters of this State whereon the natural growth of oysters or clams is of such abundance that the public have resorted to such beds or bars for a livelihood, whether continuously or at intervals, within five years prior to the resurvey or provided that at the time of the resurvey there are oysters or clams to be found naturally and in sufficiently large quantities in such beds or bars to enable

---

1. By that portion of Chapter 82 of the Acts of 1964, now codified as Code (1970 Repl. Vol.) Art. 66C, § 13K, after June 1, 1964, references in the Code to the Department of Tidewater Fisheries means the Department of Chesapeake Bay Affairs.

the public to use such bars or beds for a livelihood."

The charts within 90 days of such resurvey are to be deposited in the Department and also with the clerk of the circuit court "in which or nearest to which the area resurveyed is located."

Section 708 (d) provides for reclassification "from natural oyster bed, excluded from leasing, to barren bottom open to being leased". The Department is directed to "advertise the time, place, and purpose to reexamine the area, twice a week for two successive weeks, in a newspaper of general circulation in the county, if the area is within county waters, or in a newspaper of general circulation in the State, if the area is not within the waters of any county." [2] The section goes on to provide, "Any members of the public may be present at the reexamination." It further provides:

"If upon such reexamination the Department of Tidewater Fisheries proposes to reclassify the area from natural bed to barren bottom, it shall first hold a public hearing, and the time, place, and purpose shall be advertised as aforesaid. Any person may, by way of appeal from the decision of the Department, file petition in the circuit court of the county, at any time until expiration of thirty days from the filing of an amended chart in said circuit court showing the reclassification, and the same proceedings shall be had thereon as are now provided in subsection (k) of this section and with the same rights of appeal from the decision of the circuit court."

Section 708 (k) provides that persons may protest against a lease in the circuit courts of the respective

2. An interesting provision in that this apparently contemplates advertisement in the daily newspapers rather than in weekly newspapers commonly called "county papers" which in the rural, tidewater areas of Maryland would be most likely to bring to the attention of affected parties the contemplated action.

counties. Those courts are to "decide whether the area described in said petition is or is not within any of the prohibited areas set forth in subsection (b) * * * for which a lease shall not be granted". Provision is made for the right of appeal "by either party to' said cause from the judgment of said circuit court" with this Court to "have the power to review all questions of fact or law involved." That section then provides:

> "If the final decision shall be that the area in question is a natural oyster bar or bed, charts of the Oyster Survey of 1906 to 1912, on record in the office of the Department of Tidewater Fisheries, shall be amended accordingly."

In this case appellant Thomas Henry Pickford made application for authority to lease for the cultivation of oysters a four acre area in Talbot County several miles southeast of St. Michaels. The area had been reclassified in 1968 from oyster bottom to barren bottom. The protestant appellees are all clammers. The trial judge rendered an oral opinion in which he said:

> "As I have found, to my great chagrin, so often in dealing with conservation cases, the way the laws are written are so unclear as to be nebulous, but I have come to the reluctant conclusion on the basis of * * * Smack [v. Jackson, 238 Md. 35, 207 A. 2d 511 (1965)] that even though the charts do not define a certain area as a natural clam bed, that if the protestants can come in and by a fair preponderance of the evidence show that it is a natural clam bed or bar, because it has such a natural growth of oysters or clams, that the public have resorted to such beds or bars for a livelihood, whether continuously or at intervals, within five years prior to the resurvey, or provided that at the time of the resurvey there were oysters or clams to be found naturally and in suffi-

ciently large quantities in such beds or bars to enable the public to use such beds or bars for a livelihood. Now we have here a situation that has gotten to be quite common, a private property owner wants to take out a little bit of oyster ground and immediately the organized watermen come in and protest and testify that they have resorted to this area for a livelihood. The Department of Chesapeake Bay Affairs does not conduct a proper investigation of that bottom to determine whether or not it is a natural clam bed. They say they don't do that because it will ruin the bottom for the planting of the oysters if the lease is granted. Well certainly it may disturb the bottom for a period of time, several months, but I would think that the prospective lessee would be willing to forego that in order to be sure to get his lease, and maybe defer planting his oysters for a year until the bottom is firmed up. But here I'm confronted with a situation where we've had four or five witnesses appear on the stand and under oath say that they have resorted to this area and have caught clams there in such abundance as to make it practical. One man said he'd taken a thousand dollars worth of clams out of that area in one year. The law simply says if they go there at intervals, just go there when it's too stormy to ply their trade anywhere else, maybe only go there several times a year, that that, in effect, constitutes a natural clam bed, and I haven't any evidence here before me any direct evidence, to conflict with that. We know that there was a clam kill in 1968 so obviously there wasn't any clamming done there in '69 and therefore the absence of shells from that clamming operation which didn't take place is not meaningful. Had they only gone in there and done a job and really dredged down there fif-

teen inches or so and determined there weren't any clams there I'd have no hesitation at all in granting the lease. But I feel that I'm bound under the law to find for the protestants because they have come in here and I can't assume that these people are perjuring themselves and there's no direct evidence in conflict with what they say."

In *Smack,* to which Judge Clark alluded in his opinion, the briefs on file in this Court reflect that the case was tried upon an issue submitted to the jury:

"Does the parcel of land for which a lease is sought in this case include within its area an oyster or clam bed or bar lying under the waters of the State of Maryland whereon the natural growth of oysters or clams is of such abundance that the public have resorted to such beds or bars for a livelihood either continuously or at intervals within five years prior to the filing of the application."

The sole issue presented to this Court was whether the trial judge should have granted a directed verdict in favor of the applicant for the lease. In affirming his action in not granting such a motion, Judge Horney said for the Court:

"[T]here was evidence that clams had been taken at intervals from the disputed area in sufficient quantity to contribute to the livelihood of those who had worked the bed or bar within a five year period preceding the application for the lease. In *Popham v. Conservation Commission,* 186 Md. 62, 46 A. 2d 184 (1946), where certain areas that had been classified as natural oyster bars had become so depleted as to be useless to the public, it was held that it was proper to lease those areas which had been resurveyed

and reclassified as barren bottoms. Here, although there was evidence of the scarcity of clams, the Department of Tidewater Fisheries had not undertaken to resurvey or reclassify the bottom in the vicinity of the lease applied for by the appellant." *Id.* at 37-38.

Pickford distinguishes *Smack* pointing out that the prohibition against leasing contained in § 708 (b) relates to any clam bed appearing on the charts or amended charts and that it is undisputed in this instance that the charts do not reflect the disputed area as being a clam bed and that it is only a clam bed as defined on the charts in which a lease is not to be granted, a point not before the Court in *Smack*. Although at one point a witness from the Department said, "There are no charted clam beds in Talbot County yet.", and one could well draw the inference that the Department was not too zealous in efforts to locate clam beds in that county, he later testified to reclassification in Talbot County from "natural oyster bar to a clam bottom", and pointed out those areas and the symbols signifying the clam classification on the chart filed as an exhibit in the proceedings.

The clammers had requested the Department in 1968 to reclassify this general area from natural oyster bar. Their reason for this would be the prohibition in § 713 (c) (i) against taking soft-shell clams with a hydraulic clam dredge within 150 feet of a natural oyster bar or area leased under § 708. Some of the areas were reclassified at that time to clam bottom. Under § 708 (d) when the Department reclassifies "any submerged area of the State from natural oyster bed, excluded from leasing, to barren bottom open to being leased" persons aggrieved may resort to the courts. Since an area such as this would not be open to being leased if it were classified as a clam bed, it would follow that the clammers had a right of appeal under 708 (d) at the time of the reclassification if they thought at that time that clam bottom was the proper classification. They took no such appeal.

The prohibition in § 708 (b) is against leasing "any natural oyster bar as defined in [that] subtitle" while the prohibition relative to the leasing of crab or clam beds is as those may be "defined by the charts or amended charts". It undoubtedly is because the oyster bar prohibition does not refer to whether it is defined on the charts that § 708 (k) provides for amendment of the charts if there is a final court decision that the area is a natural oyster bar or bed but makes no similar requirement relative to clam beds.

We conclude that judgment must be reversed since the sole issue before the trial court under § 708 (k) was "whether the area described in said petition [was] or [was] not within any of the prohibited areas set forth in subsection (b)". The leasing prohibition relative to clam beds was limited to a situation where the area appeared on the charts as a clam bed. In the case of an allegation that this was a natural oyster bar the court would determine whether it was such a bar as defined under § 708 (c). It was not granted the right to determine whether this was a natural clam bed or bar under the provisions of § 708 (c).

The fact that there is one test to be applied by the courts where it is claimed there is an oyster bed (whether in fact there is one) and another test where it is claimed there is a clam bar (whether it appears on the charts) is unfortunate. The General Assembly may wish to consider change for the sake of consistency. It is equally unfortunate that there appears in this case to have been an actual clam bed and that the Department appears not to have used its best efforts to ascertain that fact. As we have indicated, the way was open, however, for the protestants under § 708 (d) to litigate that matter. They can blame only themselves—not the courts or the General Assembly—for the fact that they did not then perceive the need for having this area appear as a clam bed and elected to take no appeal.

*Judgment reversed; appellees*
*to pay the costs.*