684 A.2d 804

Frank P. LUSSIER

v.

MARYLAND RACING COMMISSION.

No. 96, Sept. Term, 1994.

Court of Appeals of Maryland.

Nov. 8, 1996.

Glenn E. Bushel (Brocato, Price & Bushel, P.A., on brief), Baltimore, for Petitioner.

Bruce C. Spizler, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on brief), Baltimore, for Respondent.

ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ., and JOHN F. McAULIFFE, Judge (Retired), Specially Assigned.

ELDRIDGE, Judge.

The single issue before us in this case concerns the validity, as applied to a racehorse owner, of a Maryland Racing Commission regulation which authorizes the Commission to impose a monetary penalty not exceeding $5,000 upon a person subject to its jurisdiction who, *inter alia*, violates the Commission's regulations.[1]

---

1. COMAR 09.10.04.03D provides as follows:

  "D. Denials of Licenses and Sanctions.
  (1) The Commission may refuse to issue or renew a license, or may suspend or revoke a license issued by it, if it finds that the applicant or licensee:
  (a) Has engaged in unethical or criminal conduct;
  (b) Is associating or consorting with an individual who has been convicted of a crime in any jurisdiction;

## I.

The petitioner, Frank P. Lussier, is a Vermont resident who purchased three thoroughbred racehorses in the spring of 1991. Later in 1991, the three horses were shipped to Maryland where they raced at the Laurel Race Course in three races on November 26, 1991, December 29, 1991, and December 31, 1991. Lussier was licensed by the Maryland Racing Commission as an owner of racehorses, and his license expired at the end of 1991. Lussier did not renew his Maryland license for 1992 or thereafter.[2]

---

(c) Is consorting or associating with, or has consorted with, a bookmaker, tout, or individual of similar pursuits;

(d) Is, or has been, operating as a bookmaker, tout, or a similar pursuit;

(e) Is not financially responsible;

(f) Has been engaged in, or attempted to engage in, any fraud or misrepresentation in connection with the racing or breeding of a horse;

(g) Assaults, or threatens to do bodily injury to, a member of the Commission or any of its employees or representatives or a member or employee of an association;

(h) Has engaged in conduct detrimental to racing; or

(i) Has violated, or attempted to violate:

(i) A law or regulation in any jurisdiction, including this State, or

(ii) A condition imposed by the Commission.

(2) Instead of, or in addition to, suspending a license, the Commission may impose a fine not exceeding $5,000.

(3) In determining the penalty to be imposed, the Commission shall consider the:

(a) Seriousness of the violation;

(b) Harm caused by the violation;

(c) Good faith or lack of good faith of the licensee; and

(d) Licensing history of the licensee."

Other regulations authorize fines or monetary penalties in various amounts, but not exceeding $5,000, for certain specific types of misconduct. *See, e.g.*, COMAR 09.10.03.02.

Although there has been no substantial change in the regulations pertinent to this case since 1992, the numbering of the regulations has changed. Except for quotations, we shall in this opinion use the current numbering of the regulations.

2. Under COMAR 09.10.01.25 and 09.10.01.28, an owner of a racehorse is not allowed to start the horse in a race subject to the Maryland Racing Commission's jurisdiction unless that owner is licensed by the Commission. The license is issued on an annual basis, and expires on December 31st of each year.

In February 1992, the Maryland Racing Commission and the Thoroughbred Racing Protective Bureau commenced an investigation with regard to the races on November 26, December 29, and December 31, to determine whether the true owner or trainer of the three horses had been concealed and whether falsified workout reports for the three horses had been published. Upon the completion of the investigation, and after a hearing before the Commission on July 1, 1992, the Commission found that Lussier had participated in "improper acts in relation to racing in violation of COMAR 09.10.01.11(A)(3);" that Lussier transferred two of his horses "from himself to the name of another person for a purpose other than the legitimate sale of the horses in violation of COMAR 09.10.01.11(A)(14);" and that Lussier perpetrated "dishonest acts in connection with his activities, responsibilities and duties on the race track, and has engaged in conduct detrimental to racing in violation of COMAR 09.10.01.25(B)(8)." In an order issued on July 24, 1992, the Commission imposed a $5,000 fine upon Lussier.[3]

Lussier filed an action in the Circuit Court for Baltimore County for judicial review of the Commission's decision, challenging the administrative decision on several grounds. After a hearing, the circuit court upheld the Commission's order imposing a $5,000 fine upon Lussier. Lussier appealed to the Court of Special Appeals, again raising numerous issues. The intermediate appellate court rejected each of Lussier's contentions and affirmed. *Lussier v. Maryland Racing Comm'n,* 100 Md.App. 190, 640 A.2d 259 (1994). Lussier then filed in this Court a petition for a writ of certiorari, presenting all of the issues which he had raised in both courts below. This Court granted the petition limited to a single question, namely whether the Commission could, in accordance with its regulation, impose a fine as a sanction for misconduct absent a

---

3. In light of the limited issue before this Court, we have no occasion to set forth the evidence presented at the administrative hearing regarding Lussier's misconduct. A detailed review of the evidence is contained in the comprehensive opinion of the Court of Special Appeals. *See Lussier v. Maryland Racing Comm'n,* 100 Md.App. 190, 640 A.2d 259 (1994).

statutory provision expressly authorizing the imposition of a fine.

## II.

Lussier argues that it is an "elementary" principle of Maryland law that administrative agencies lack the authority to fix "penalties in the absence of specific statutory authorization from the Legislature," and that "it has always been the Legislature's exclusive province to fix penalties . . . for transgressions of the law, either directly or via *specific* delegation." (Petitioner's brief at 10, 17). Lussier cites three cases which he claims support this alleged principle of Maryland administrative law. They are *Holy Cross Hosp. v. Health Services,* 283 Md. 677, 393 A.2d 181 (1978); *Gutwein v. Easton Publishing Co.,* 272 Md. 563, 325 A.2d 740 (1974), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 673 (1975); and *County Council v. Investors Funding,* 270 Md. 403, 312 A.2d 225 (1973). According to Lussier, since the General Assembly did not explicitly authorize the Commission to impose a fine upon a racehorse owner, the Commission's order in this case "is a nullity" (Petitioner's brief at 10). Lussier asserts that the Commission's regulation authorizing the imposition of a fine, COMAR 09.10.04.03D, is invalid except as applied to those licensed racetrack operators who have been awarded racing dates. (Petitioner's brief at 16–18). *See* Maryland Code (1992, 1995 Supp.), § 11–308(d) of the Business Regulation Article (expressly authorizing the Commission to impose a monetary penalty not exceeding $5,000 upon racetrack operators who, *inter alia,* violate the statute or the Commission's regulations).

As pointed out by the Court of Special Appeals, *Lussier v. Maryland Racing Comm'n, supra,* 100 Md.App. at 203–204, 640 A.2d at 266, this Court's prior cases relied upon by Lussier neither recognize nor support the assertion that, under Maryland law, an administrative agency lacks authority to impose a particular penalty unless it has explicit authorization from the Legislature to do so. *Holy Cross Hosp. v. Health Services, supra,* was not concerned with the imposition

of penalties; instead, the question in that case was whether, as a matter of statutory construction, an administrative agency's statutory authority to regulate hospital rates extended to fees charged by physicians to hospital patients. In *Gutwein v. Easton Publishing Co., supra,* 272 Md. at 576, 325 A.2d at 747, the issue ,was whether, .under the pertinent statutory provisions and "[i]n view of the [Human Relations] Commission's legislative background," the Human Relations Commission was authorized to make an award of compensatory damages to a victim of employment discrimination. Neither a penalty nor a regulation adopted by the agency was involved in the *Gutwein* case. The portion of *County Council v. Investors Funding, supra,* 270 Md. at 441–443, 312 A.2d at 246–247, relating to monetary penalties, had nothing to do with an administrative agency's imposition of a particular type of penalty without express statutory authorization. In fact, in *Investors Funding* there was express statutory authorization for the agency to impose monetary penalties. The issue in that case concerned the validity of the *statute* in light of constitutional delegation of powers and due process principles.

Neither the Maryland cases relied on by Lussier, nor any other decisions of this Court which have been called to our attention, set forth or support a general principle that a state administrative agency lacks authority, by regulation, to fix a civil penalty for misconduct subject to its jurisdiction unless the General Assembly has expressly authorized the agency to fix that type of penalty.

Instead, the cases invoked by Lussier, as well as numerous other decisions by this Court, indicate that, in determining whether a state administrative agency is authorized to act in a particular manner, the statutes, legislative background and policies pertinent to that agency are controlling. *See, e.g., Comptroller v. Washington Restaurant,* 339 Md. 667, 670–673, 664 A.2d 899, 900–902 (1995); *Luskin's v. Consumer Protection,* 338 Md. 188, 196–198, 657 A.2d 788, 792–793 (1995); *Fogle v. H & G Restaurant,* 337 Md. 441, 654 A.2d 449 (1995); *Christ v. Department of Natural Resources,*

335 Md. 427, 437, 440, 644 A.2d 34, 38, 40 (1994); *McCullough v. Wittner,* 314 Md. 602, 610–612, 552 A.2d 881, 885–886 (1989); *Consumer Protection v. Consumer Pub.,* 304 Md. 731, 756–759, 501 A.2d 48, 61–63 (1985); *Holy Cross Hosp. v. Health Services, supra,* 283 Md. at 683–689, 393 A.2d at 184–187; *Gutwein v. Easton Publishing Co., supra,* 272 Md. at 575–576, 325 A.2d at 746–747. Moreover, with regard to the validity of a regulation promulgated by an administrative agency, the governing standard is whether the regulation is " 'consistent with the letter and spirit of the law under which the agency acts.' " *Christ v. Department of Natural Resources, supra,* 335 Md. at 437, 644 A.2d at 38, quoting *Department of Transportation v. Armacost,* 311 Md. 64, 74, 532 A.2d 1056, 1061 (1987). *See also Fogle v. H & G Restaurant, supra,* 337 Md. at 453, 654 A.2d at 455, and cases there cited.

## III.

■ Turning to the statutes applicable to the Maryland Racing Commission, title 11, subtitle 2, of the Business Regulation Article of the Maryland Code establishes the Commission, provides for its membership and staff, and sets forth generally the authority of the Commission. Instead of particularizing various powers of the Commission with regard to racehorse owners, trainers, jockeys, and others involved in Maryland racing, the statutory provisions, in § 11–210, broadly authorize the Commission to "adopt regulations ... to govern racing and betting on racing in the State," and then specify four types of regulations which the Commission may not adopt. Thus, § 11–210 of the Business Regulation Article states in relevant part as follows:

"**§ 11–210. Regulatory power of Commission.**

(a) *In general.*—Except as provided in subsection (b) of this section, the Commission may:

(1) adopt regulations and conditions to govern racing and betting on racing in the State ...

(b) *Prohibited regulations.*—The Commission may not adopt regulations that allow:

    (1)  racing a breed of horse not now authorized by law; or

    (2)  holding currently unauthorized:

        (i)  intertrack betting;

        (ii)  off-track betting; or

        (iii)  telephone betting other than telephone account betting."

This Court has consistently held that, where the Legislature has delegated such broad authority to a state administrative agency to promulgate regulations in an area, the agency's regulations are valid under the statute if they do not contradict the statutory language or purpose. We have repeatedly rejected the argument, similar to that made by Lussier here, that the Legislature was required expressly or explicitly to authorize the particular regulatory action. Recently in *Christ v. Department of Natural Resources, supra,* 335 Md. at 437–439, 644 A.2d at 38–39, in upholding a Department of Natural Resources regulation prohibiting persons under the age of 14 from operating certain types of watercraft, we explained (335 Md. at 437–438, 644 A.2d at 39):

"In the State Boat Act, . . . the General Assembly broadly granted to the Department the authority to adopt regulations governing the 'operations of any vessels' which are subject to the Act. In numerous situations where the General Assembly has delegated similar broad power to an administrative agency to adopt legislative rules or regulations in a particular area, this Court has upheld the agency's rules or regulations as long as they did not contradict the language or purpose of the statute.

"For example, in *Jacobson v. Md. Racing Comm'n,* 261 Md. 180, 186, 274 A.2d 102, 104–105 (1971), where the pertinent statute gave the Racing Commission the 'full power to prescribe rules, regulations and conditions under which all horse races shall be conducted,' the contention that the legislative delegation of power did not reach a rule regulating the transfer of race horses was characterized by this Court as an argument which 'approaches the frivolous.' "

After reviewing numerous other cases in this Court upholding various types of regulations under broad delegations of authority to administrative agencies, we went on in *Christ* to reject an argument like that advanced by Lussier in the present case (335 Md. at 439, 644 A.2d at 39):

> "The crux of the plaintiff's argument concerning absence of statutory authority is that 'there is no specific delegation of authority by the General Assembly to the Department permitting the Department to promulgate regulations which *prohibit* the use of vessels by an entire class of citizens of the State.' (Plaintiff's brief at 10). As the above-cited cases demonstrate, however, such specificity is not required. The broad authority to promulgate 'regulations governing the ... operations of any vessels' plainly encompasses a regulation prohibiting the operation of certain motor vessels by persons under 14."

*See Fogle v. H & G Restaurant, supra,* 337 Md. at 455, 654 A.2d at 456 (in upholding an administrative regulation prohibiting smoking in most workplaces, even though the statute did not expressly address the matter, this Court pointed out "that courts should generally defer to agencies' decisions in promulgating new regulations because they presumably make rules based upon their expertise in a particular field").

Similarly, the broad authority granted by the Legislature to the Maryland Racing Commission to promulgate regulations "to govern racing and betting on racing" plainly encompasses a regulation authorizing the imposition of a monetary penalty, not exceeding $5,000, upon a racehorse owner who engaged in Lussier's deceptive misconduct in connection with three races at the Laurel Race Course. The regulation in no manner contradicts the language of the statutes relating to the Commission.

Moreover, the regulation authorizing the imposition of a fine is entirely in accord with the statutory purpose. We have often stated that "[t]he Legislature's purpose in granting to the Racing Commission the authority to promulgate rules was to assure that horse races in Maryland are 'conducted fairly,

decently and clean[ly],' " *Heft v. Md. Racing Comm'n,* 323 Md. 257, 263–264, 592 A.2d 1110, 1113 (1991), quoting *Mahoney v. Byers,* 187 Md. 81, 84, 48 A.2d 600, 602 (1946). The "Commission performs an active role of policy formation in order to ensure the integrity of horse racing in this State." *Maryland Racing Com'n v. Castrenze,* 335 Md. 284, 294, 643 A.2d 412, 416–417 (1994). *See Greenfeld v. Maryland Jockey Club,* 190 Md. 96, 105, 57 A.2d 335, 338 (1948) (one of purposes of the statute and regulations was to insure that "[t]he law protects bettors against fraud").

If we were to accept Lussier's argument that the Maryland Racing Commission is powerless to impose any penalty or sanction without express statutory authority relating to that type of penalty, then racehorse owners, trainers, jockeys and others could commit numerous deceptions and frauds upon bettors and the public, and the Commission could do little about it. The statutory purpose requires that the Commission be able to sanction misconduct in connection with racing. The challenged regulation is, therefore, clearly consistent with the statutory purpose of insuring the integrity of racing and protecting the public from fraud.

As the General Assembly has delegated broad power to the Maryland Racing Commission to adopt regulations "to govern racing and betting on racing in the State," and as the regulation providing for the imposition of a monetary penalty does not contradict the statutory language or purpose, the regulation is statutorily authorized under a consistent line of this Court's decisions dealing with the regulatory authority of state administrative agencies.

## IV.

Furthermore, the history, nature and rationale of the regulatory scheme governing horse racing in this State, as well as actions by the General Assembly and opinions by this Court, confirm the validity of the regulation authorizing the imposition of a fine upon racehorse owners, trainers, jockeys, etc., engaging in misconduct.

Prior to 1920, the licensing and regulation of horse racing and betting on horse races in Maryland was accomplished on a county-by-county basis. In a few jurisdictions, local racing commissions were created to license and regulate horse racing. In most counties, the circuit courts issued licenses. Much of the regulation was accomplished by statutes with criminal sanctions enforced by the state's attorney for each county. For a review of the pre–1920 licensing and regulation of horse racing, see, e.g., *Nolan v. State*, 157 Md. 332, 146 A. 268 (1929); *Close v. Southern Md. Agr. Asso.*, 134 Md. 629, 108 A. 209 (1919); *Agri. Soc. of Montgomery County v. State*, 130 Md. 474, 101 A. 139 (1917); *Clark v. Harford Agri. & Breeders' Asso.*, 118 Md. 608, 85 A. 503 (1912), overruled on other grounds, *Howard County Metropolitan Comm. v. Westphal*, 232 Md. 334, 342, 193 A.2d 56, 61 (1963); *State v. Dycer*, 85 Md. 246, 36 A. 763 (1897).

In 1919, this Court held that the statutes providing for the licensing of horse racing by the circuit courts were unconstitutional because they imposed nonjudicial functions and duties upon the circuit courts in violation of the separation of powers requirement in Article 8 of the Maryland Declaration of Rights. *Close v. Southern Md. Agr. Asso., supra,* 134 Md. 629, 108 A. 209.

In response to the *Close* case, the General Assembly in 1920 adopted an entirely new statewide scheme of licensing and regulating horse racing which has continued, largely intact, until the present time. By Ch. 273 of the Acts of 1920, the Legislature created the Maryland Racing Commission as a state agency, whose members were appointed by the Governor, and whose jurisdiction encompassed "any meeting within the State of Maryland whereat horse racing shall be permitted for any stake, purse or reward." Ch. 273 of the Acts of 1920, § 1, subsection 1. The 1920 statute contained somewhat detailed provisions with regard to the licensing and regulation of "[a]ny person or persons, association or corporation desiring to conduct racing within the State of Maryland," *id.,* subsection 7. Apart from the provisions concerning racetrack owners or operators who conducted racing, however, the 1920

statute broadly stated that the "Racing Commission shall have full power to prescribe rules, regulations and conditions under which all horse-races shall be conducted within the State of Maryland. Said Commission may make rules governing, restricting or regulating betting on such races," *id.*, subsection 11.

As the 1920 statute did not expressly authorize the Maryland Racing Commission to license and regulate racehorse owners, trainers, jockeys, etc., in 1921 the Attorney General was specifically asked whether the Commission was authorized to license trainers and jockeys. Judge Motz for the Court of Special Appeals in the present case summarized the Attorney General's response as follows (*Lussier v. Maryland Racing Comm'n, supra,* 100 Md.App. at 205–206, 640 A.2d at 267):

> "In 1921, the Attorney General was asked whether the above quoted general powers permitted the Commission to require that jockeys and trainers be licensed. 6 Opp. Att'y Gen. at 480. In concluding that licensing of jockeys and trainers was within the scope of authority granted the Commission, the Attorney General specifically recognized that 'no control over them [was] given the Commission by any express provision in the [Act],' *id.* at 481, and that very few of the Commission's express statutory powers dealt with 'the regulation of racing itself.' *Id.* at 480. The Attorney General noted that the reason for this was that the legislature 'realized that the formulation of adequate, practical and satisfactory regulations [governing those involved in racing itself] involved a knowledge of racing conditions which the General Assembly did not possess, and which could only be acquired by a careful study of racing, and of the many problems connected therewith.' *Id.*"

The Court of Special Appeals went on to point out that the 1921 Attorney General's opinion

> "concluded that even though the Commission was given no express statutory control over, let alone power to license, jockeys and trainers, the General Assembly intended that it have this power. He reasoned:

'There can be no full and complete control of racing on the part of the Commission, unless it controls those upon whose skill and honesty the outcome of the race so largely depends. All other regulations, rules and conditions prescribed by the Commission for the purpose of securing clean racing and elevating the standards by which racing is to be conducted in Maryland could be nullified by dishonest and purchasable jockeys and trainers.... I do not believe, ... that the Legislature intended that jockeys and trainers, whose probity is so essential a feature of clean racing, should be entirely beyond the control of the Commission.... [The Act was] clearly designed to give the Commission *broad and sweeping powers of control and regulation of racing,* and I am of the opinion that, in spite of the [limited] authorization expressly conferred therein, the Commission possess *practically unlimited power to pass, promulgate and enforce* such rules and regulations actually dealing with the control of racing as in the judgment of the Commission appear to be desirable and necessary.

*Id.* at 481–82 (emphasis added). Thus, since the General Assembly had given the Commission 'full power' to regulate horseracing, the Attorney General found that the Commission could not do so without the ability to 'full[y] and complete[ly]' control 'those upon whose honesty and skill the outcome of races depended.' *Id.* 480–81."

With regard to the 1921 opinion of the Attorney General taking the position that the Racing Commission's authority extended to racehorse owners, trainers, jockeys, and others not expressly covered by the statutory language, this Court in *Mahoney v. Byers, supra,* 187 Md. at 84–85, 48 A.2d at 602, stated:

"At the outset it may be stated that under the Act of 1920, Chapter 273, Article 78B, Code 1939, which created the Maryland Racing Commission, it has power and authority to promulgate reasonable rules to govern the racing of horses. It may make such rules regulating the conduct of trainers, jockeys, owners, and generally regulate all matters

pertaining to horse racing, in order that they may be conducted fairly, decently and clean[ly] but may not revoke a license except for cause. 6 *Opinions of Attorney General* 480; 11, 273; 24, 662.

"These decisions of the Attorneys General have governed the Commission for a long time, and Attorney General Armstrong's decision was rendered shortly after the passage of the Act. We see no reason to alter or disturb these decisions, long applied. *Popham v. Conservation Commission*, 186 Md. 62, 46 A.2d 184; *Baltimore City v. Machen*, 132 Md. 618, 104 A. 175."

As previously mentioned, the basic scheme of the 1920 statute has continued until the present time. Under Maryland Code (1992, 1995 Supp.), title 11 of the Business Regulation Article, the General Assembly has legislated in detail with respect to those licensees who hold race meetings in Maryland, *i.e.*, the owners or operators of race courses. *See, e.g.*, §§ 11–301 through 11–320, 11–501 through 11–526, 11–601 through 11–620, 11–701 through 11–704, 11–801 through 11–812, and 11–1001 of the Business Regulation Article. Thus, the Maryland Racing Commission is expressly authorized by statute to grant or deny licenses to those desiring to hold race meetings, to "suspend or revoke a license" to hold a race meeting, or to "impose a penalty not exceeding $5,000 for each racing day" that the licensee holding a race meeting is in violation of the statute or a Commission regulation or a condition set by the Commission.[4]

---

4. Section 11–308 of the Business Regulation Article states as follows:
   "**11–308. Denials, reprimands, suspensions, and revocations— Grounds; penalty.**
   (a) *In general.*—Subject to the hearing provisions of §§ 11–309 and 11–310 of this subtitle, the Commission may deny a license to an applicant or discipline a licensee in accordance with this section.
   (b) *Denials.*—The Commission may deny a license to any applicant for any reason that the Commission considers sufficient.
   (c) *Reprimands, suspensions, and revocations.*—(1) The Commission may reprimand any licensee or suspend or revoke a license if the licensee violates:
   (i) this title;

Nevertheless, with regard to other persons involved in Maryland racing and subject to the Commission's jurisdiction, such as racehorse owners, trainers, jockeys, grooms, etc., the statutory provisions largely remain silent. There are no statutory sections, comparable to those cited above, relating to racehorse owners, trainers or jockeys. Instead, the General Assembly has simply granted to the Commission the broad authority to regulate racing in Maryland, and has specified a few areas which are beyond the Commission's authority to adopt regulations.

In accordance with this statutory scheme, and the 1921 Attorney General's opinion, the Maryland Racing Commission since 1921 has adopted regulations governing racehorse owners, trainers, jockeys, and others which, to the extent that is relevant, parallel the statutory provisions concerning racetrack operators. Thus, the regulation at issue in the present

---

(ii) a regulation adopted under this title; or

(iii) a condition set by the Commission.

(2) The Commission shall suspend or revoke a license if the applicant or licensee fails to:

(i) keep records and make reports of ownership of stock that are required under § 11–314 of this subtitle; or

(ii) make a reasonable effort to get affidavits required under § 11–314(b) and (c) of this subtitle.

(d) *Penalty.*—(1) The Commission may impose a penalty not exceeding $5,000 for each racing day that the licensee is in violation of subsection (c) of this section:

(i) instead of suspending or revoking a license under subsection (c)(1) of this section; and

(ii) in addition to suspending or revoking a license under subsection (c)(2) of this section.

(2) To determine the amount of the penalty imposed under paragraph (1) of this subsection, the Commission shall consider:

(i) the seriousness of the violation;

(ii) the harm caused by the violation; and

(iii) the good faith or lack of good faith of the licensee.

(3) A penalty imposed on a licensee shall be paid from the licensee's share of the takeout."

For purposes of § 11–308, a " '[l]icensee' means a person who has been awarded racing days for the current calendar year." § 11–101(h) of the Business Regulation Article. *See also* § 11–302 of the same Article (indicating that a licensee is a "person [who] holds a race meeting in the State . . .").

case, COMAR 09.10.04.03D, providing for the suspension or revocation of licenses, or the imposition of a fine not exceeding $5,000, with respect to those engaging in specified types of misconduct, parallels § 11–308 of the Business Regulation Article which provides for suspensions or revocations of licenses, or monetary penalties up to $5,000, of racetrack operators who engage in specified types of misconduct.

Moreover, the authority to impose a fine upon racehorse owners, trainers, jockeys, etc., has been set forth in the Commission's regulations consistently since the first regulations in 1921. Thus, the 1921 regulations permitted stewards to suspend the licenses of or impose a fine not exceeding $200 upon "[o]wners, trainers, jockeys, grooms, and other persons attendant on horses. . . ." 1921 Rules of Racing, Rules 24 and 27. Furthermore, if the maximum of $200 was deemed insufficient, the stewards could so advise the Commission which could impose a higher penalty. *Id.*, Rule 27. Consequently, the Commission's authority under the statute, to impose a monetary penalty upon racehorse owners and others guilty of misconduct, is supported by the long and consistent administrative construction of the statute. The General Assembly has not, over the past 75 years, changed that administrative construction of the statute.[5] *See, e.g., Md. Classified Employees Asso., Inc. v. Governor,* 325 Md. 19, 33, 599 A.2d 91, 98 (1991) ("legislative acquiescence in a long-standing administrative construction ' "gives rise to a strong presumption that the

---

**5.** The General Assembly has clearly been aware of the Maryland Racing Commission's regulation authorizing the imposition of fines upon racehorse owners, jockeys, trainers, and others, and has legislated with respect to those fines. *See, e.g.,* Ch 786 of the Acts of 1947, authorizing the Commission to establish "the Relief Fund of the Maryland Racing Commission," referring in both the title and the preamble to the "fines and [monetary] penalties . . . collected from jockeys, trainers, owners and others," and providing that such fines should continue to be paid into the Relief Fund.

*See also* the Department of Fiscal Service's Sunset Review of the Maryland Racing Commission for 1989, at 37–38, referring to the Commission's authority to impose fines upon "general" licensees such as racehorse owners, trainers and jockeys, and commending the effectiveness of these monetary penalties.

interpretation is correct" ' "); *Morris v. Prince George's County,* 319 Md. 597, 613, 573 A.2d 1346, 1354 (1990) ("long-standing administrative construction of [the statute] and its predecessor statutes by an agency charged with administering them ... is entitled to deference"); *Board v. Harker,* 316 Md. 683, 699, 561 A.2d 219, 227 (1989) ("the agency rule is entitled to considerable weight in determining the meaning of [the statute's] provisions"); *McCullough v. Wittner, supra,* 314 Md. at 612, 552 A.2d at 886 ("The interpretation of a statute by those officials charged with administering the statute is, of course, entitled to weight"); *Sinai Hosp. v. Dep't of Employment,* 309 Md. 28, 46, 522 A.2d 382, 391 (1987) ("the long-standing legislative acquiescence [in the administrative interpretation of the statute] gives rise to a strong presumption that the interpretation is correct"); *Balto. Gas & Elec. v. Public Serv. Comm'n,* 305 Md. 145, 161, 501 A.2d 1307, 1315 (1986) ("the contemporaneous interpretation of a statute by the agency charged with its administration is entitled to great deference, especially when the interpretation has been applied consistently and for a long period of time"); *Consumer Protection v. Consumer Pub., supra,* 304 Md. at 759, 501 A.2d at 63 ("The consistent construction of a statute by the agency responsible for administering it is entitled to considerable weight").

This Court has often pointed to the Commission's broad regulatory authority, and we have regularly upheld the application of the Commission's regulations, including the penalty provisions, to racehorse owners, trainers, jockeys and others. In *Jacobson v. Md. Racing Commission, supra,* 261 Md. 180, 274 A.2d 102, Jacobson was both a racehorse owner and trainer who violated a Commission regulation which prohibited an owner or trainer who had claimed a horse in a Maryland claiming race from selling it within 60 days of the claim. The Commission fined Jacobson $2,500 for claiming a horse in a Maryland race and selling the horse in New York before the expiration of the 60–day period. Jacobson principally contended that the Commission's regulation prohibiting the sale of the claimed horse for 60 days was invalid; he argued, *inter*

*alia,* that the Legislature had not delegated to the Commission the authority to apply its regulations to events occurring outside of Maryland. In response, Chief Judge Hammond for the Court explained the necessity for conferring broad regulatory authority upon the Commission (261 Md. at 183, 274 A.2d at 103):

> "Horse racing is an endeavor and undertaking that necessarily must be the subject of intensive, extensive and minute regulation. *Greenfeld v. Md. Jockey Club,* 190 Md. 96, 104–105, 57 A.2d 335. It exists only because it is financed by the receipts from controlled legalized gambling which must be kept as far above suspicion as possible, not only to sustain and profit the racing fraternity but to feed substantial ... millions to the State's revenues. Not surprisingly the legislature has given the Commission full power to control racing."

Addressing the argument that the Commission's regulation prohibiting the sale of the horse within 60 days was not authorized by the language of the statute, Chief Judge Hammond succinctly stated (261 Md. at 186, 274 A.2d at 105):

> "Jacobson's argument that the legislature's delegations to the Commission of the power to regulate racing does not extend to the regulation imposed by Rule 80 approaches the frivolous, and we turn to his constitutional arguments."

Although Jacobson had not specifically challenged the Commission's authority to impose a $2,500 fine if the regulation concerning the sale of claimed horses was valid, nevertheless this Court concluded its opinion as follows (261 Md. at 190, 274 A.2d at 107, emphasis supplied):

> "We think that Jacobson had become a racing citizen of Maryland as far as the purposes and effects of the Rules are concerned and that this State acquired sufficient personal jurisdiction over him in matters of licensed racing to permit it to enjoin him by Rule 80 from selling a horse claimed in a licensed Maryland race for sixty days, *and to punish him if he disobeyed that rule.*"

For other cases recognizing the broad authority of the Maryland Racing Commission to promulgate and enforce regulations appropriate to insure the integrity of Maryland racing, *see, e.g., Maryland Racing Com'n v. Castrenze, supra,* 335 Md. at 294–295, 643 A.2d at 417 (in affirming the Commission's application of a regulation providing for reciprocal suspensions, we commented that "[t]he Racing Commission is given broad statutory authority to adopt regulations governing horse racing and betting on racing in Maryland"); *Heft v. Md. Racing Comm'n,* 323 Md. 257, 264, 592 A.2d 1110, 1113 (1991) (applying numerous Commission regulations, and pointing out that "[t]he statute and 'the Commission's rules and regulations provide a comprehensive scheme for the regulation of horse racing in Maryland,' " quoting *Silbert v. Ramsey,* 301 Md. 96, 105, 482 A.2d 147, 152 (1984)); *Southern Md. Agri. Ass'n of Prince George's County v. Magruder,* 198 Md. 274, 280, 81 A.2d 592, 594 (1951) ("The Maryland Racing Commission is given exceedingly wide and comprehensive regulatory powers. * * * It is apparent that the Legislature deliberately imposed grave responsibility upon the Racing Commission in order that this [betting on horse races] exception to the anti-gambling laws of the State be kept within proper limits"); *Brann v. Mahoney,* 187 Md. 89, 103, 48 A.2d 605, 611 (1946) (the Racing Commission "may make rules regulating the conduct of trainers, jockeys, and owners in order that horse racing may be conducted fairly").

As discussed earlier, acceptance of Lussier's argument, that a Maryland Racing Commission regulation authorizing the Commission to impose a particular type of penalty must be expressly authorized by the statutory language, would leave the Commission in a position whereby it could promulgate regulations governing the conduct of racehorse owners, trainers, jockeys and others, but could not enforce those regulations. The statutory provisions do not expressly authorize the imposition of any particular type of sanction upon racehorse owners, trainers, jockeys, etc. The Commission's authority to suspend or revoke the licenses of racehorse owners, trainers, jockeys and others, like the authority to impose monetary

penalties upon them, is based entirely upon the Commission's regulations. It is inconceivable that the General Assembly intended to grant broad authority to the Commission to regulate the conduct of these individuals, but did not intend that the Commission be able to enforce its regulations by sanctions.

Finally, even if there were some statutory basis to distinguish between the revocation or suspension of a license on the one hand, and the imposition of a monetary penalty on the other,[6] the inability to impose a fine would still leave the Racing Commission powerless to enforce its regulations under circumstances like those in the instant case. After the race on December 31, 1991, which was the last day before expiration of Lussier's license, Lussier left Maryland and did not thereafter seek to renew his license as a racehorse owner. When his misconduct was discovered, Lussier neither possessed nor desired a Maryland license. There was nothing to revoke or suspend. Under the circumstances, the imposition of a monetary penalty was the only sanction that could be imposed upon Lussier to enforce the regulations of the Commission. We very much doubt that the Legislature intended that a racehorse owner could come into Maryland, enter his horses in Maryland races with the true names of the owner and trainer disguised, publish false workout reports, make a large sum of money by betting on his horses at the track,[7] and then escape any sanction for his misconduct because he did not desire to renew his Maryland license.

We conclude, in agreement with both courts below, that the Maryland Racing Commission's regulation authorizing the imposition of a reasonable fine is valid.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY COSTS.*

---

6. We hasten to add that no such basis in the statutory provisions has been suggested to us.

7. Lussier collected more than $30,000 winnings on the three races in question.

BELL, Judge, dissenting.

Administrative agencies are an important, if not essential, part of the legal and governmental landscape and, in any event, permanent fixtures in today's society. Indeed, there is likely not a single Marylander who has not had at least a modicum of interaction with an administrative agency. As one commentator has observed:

> A Marylander today is born under the auspices of a doctor whose qualifications have been passed upon by a Board of Medical Examiners, and a nurse whose fitness has been determined by the State Board of Examiners of Nurses. If he attends the public schools, the scope of his education and the text books which mold his thoughts are selected or approved by the State Board of Education. If, after his schooling, he wishes to become a doctor, lawyer, dentist, architect or plumber, he must satisfy the appropriate State board of his qualifications before he can begin to earn his living. His very movements to and from work bring him into close contact with the processes of administrative law. The carfare or taxicab fare which he pays are determined by the Public Service Commission; if he drives an automobile, his license may be revoked for any cause which the Commissioner of Motor Vehicles deems sufficient; he cannot even take to the air without a license from the State Aviation Commission ....if he places a bet at a race track, he does so under the rules and regulations prescribed by the Maryland Racing Commission....

Reuben Oppenheimer, *Administrative Law in Maryland*, 2 Md. L.Rev. 185, 186 (1938). Their purpose is to, and, in fact they do, make government more efficient; thus, administrative agencies are critical to the proper working of government. Administrative law involves the nature of the operations of administrative agencies, as well as the control exercised by courts over their creation and activities. *Id.* at 187.

An administrative agency, as a creature of statute, has only the power its enabling statute delegates to it. *Commission on Med. Discipline v. Stillman*, 291 Md. 390, 413, 435 A.2d 747,

759 (1981). *See also Holy Cross Hosp. of Silver Spring, Inc. v. Health Servs. Cost Review Comm'n,* 283 Md. 677, 683, 393 A.2d 181, 184 (1978); *Mayor and City Council of Baltimore v. William E. Koons, Inc.,* 270 Md. 231, 236–37, 310 A.2d 813, 816–17 (1973) (quoting 1 Am.Jur.2d *Administrative Law* § 132 (1962); *Gino's v. Baltimore City,* 250 Md. 621, 640, 244 A.2d 218, 228–229, (1968)); "it has no inherent powers and its authority thus does not reach beyond the warrant provided it by statute." *Holy Cross Hospital,* 283 Md. at 683, 393 A.2d at 184; *Phelps Dodge Corp. v. National Labor Relations Board,* 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941) (the primary function of an administrative agency is to carry out the will of the State as enunciated in the legislation creating it). Administrative agencies exist because the Legislature does not have, and can not be expected to be able to acquire, the necessary sophisticated and specific knowledge in the variety of areas for which government has responsibility. *Sullivan,* 293 Md. at 122, 442 A.2d at 563. *See also,* 1 Am.Jur.2d *Administrative Law,* (1942). By contrast, an administrative agency is able to acquire the requisite expertise and, so, perform the task or administer the program with which it is charged. *Dep't of Natural Resources v. Linchester Sand & Gravel Corp.,* 274 Md. 211, 220, 334 A.2d 514, 522 (1975); *Tighe v. Osborne,* 150 Md. 452, 463, 133 A. 465, 469 (1926) (an administrative agency has "the task of acquiring information, working out the details, and applying these rules and standards [which it has been provided for guidance] to specific cases.").

In the administrative law context, the exercise, by an administrative agency, without specific legislative authorization, of the power to fine is the exercise, by that agency, of the power to make laws. Furthermore, the imposition of a penalty, such as a fine, is an adjudicatory matter. But the power to make laws is a legislative function and the power to adjudicate ordinarily is reserved to the judiciary. The Legislature, without, at the least, providing safeguards and standards to direct its exercise, may not delegate the former power to an administrative agency, an arm of the executive branch of government. *Department of Transportation v. Armacost,* 311 Md. 64, 80,

532 A.2d 1056, 1063 (1987); *Pressman v. Barnes,* 209 Md. 544, 555, 121 A.2d 816, 822 (1956). Principles of due process, including proportionality, are applicable to the exercise of the latter power. *Aravanis v. Somerset County,* 339 Md. 644, 665, 664 A.2d 888, 898 (1995); *Henry v. State,* 273 Md. 131, 149, 328 A.2d 293, 304 (1974) ("The punishment ought to bear a due proportion to the offense"). Thus, notwithstanding the breadth of the scope of Maryland Code (1992) § 11–209[1] of the Business Regulation Article, neither it, nor § 11–210[2], authorizing the adoption of regulations, justified the respondent Maryland State Racing Commission in adopting that portion of the regulation pursuant to which the actions in this case were taken, COMAR 09.10.04.03D.[3] That regulation pur-

---

1. Maryland Code (1992) § 11–209 of the Business Regulation Article provides:

   (a) *In general.*—Besides its other powers under this title, the Commission has the powers necessary or proper to carry out fully all the purposes of this title.

   (b) *Scope.*—The jurisdiction, supervision, powers, and duties of the Commission extend to each person who holds racing for a purse, reward, or stake.

2. That section provides:

   (a) *In general.*—Except as provided in subsection (b) of this section, the Commission may;

   (1) adopt regulations and conditions to govern racing and betting on racing in the State; and

   (2) approve or disapprove:

      (i) prices that a licensee may set for admission to a race, a service performed, or an article sold at a track; and

      (ii) the size of the purse, reward, or stake to be offered at a race.

   (b) *Prohibited regulations.*—The Commission may not adopt regulations that allow:

   (1) racing a breed of horse not now authorized by law;  or

   (2) holding currently unauthorized:

      (i) intertrack betting;

      (ii) off-track betting;  or

      (iii) telephone betting other than telephone account betting.

3. COMAR 09.10.04.03D provides:

   D. Denials of Licenses and Sanctions.

   (1) The Commission may refuse to issue or renew a license, or may suspend or revoke a license issued by it, if it finds that the applicant or licensee:

      (a) Has engaged in unethical or criminal conduct;

ported to empower the Commission to impose sanctions, including fines. Never before today has this Court approved, under the circumstances that exist *sub judice*, an administrative agency's exercise of the power to fine. I am convinced that it is unwise to do so now.

Notwithstanding that, as a creature of statute, an administrative agency has only that authority that is delegated to it, *Sullivan supra*, 293 Md. at 124, 442 A.2d at 564; *Stillman*, 291 Md. at 413, 435 A.2d at 759; *William E. Koons, Inc.*, 270 Md. at 236-37, 310 A.2d at 816-17, broad delegations of authority have been upheld. In fact, such delegations are particularly appropriate in some areas, *e.g.* "where the discretion to be exercised relates to police regulations for the protection of public morals, health, safety, or general welfare." *Pressman v. Barnes, supra*, 209 Md. at 555, 121 A.2d at 822.[4]

---

(b) Is associating or consorting with an individual who has been convicted of a crime in any jurisdiction;

(c) Is consorting or associating with, or has consorted with, a bookmaker, tout, or individual of similar pursuits;

(d) Is, or has been operating as a bookmaker, tout, or a similar pursuit;

(e) Is not financially responsible;

(f) Has been engaged in, or attempted to engage in, any fraud or misrepresentation in connection with the racing or breeding of a horse;

(g) Assaults, or threatens to do bodily injury to, a member of the Commission or any of its employees or representatives or a member or employee of an association;

(h) Has engaged in conduct detrimental to racing; or

(i) Has violated or attempted to violate:

(i) A law or resolution in any jurisdiction, including this State, or

(ii) A condition imposed by the Commission.

(2) Instead of, or in addition to, suspending a license, the Commission may impose a fine not exceeding $5,000.

(3) In determining the penalty to be imposed, the Commission shall consider the:

(a) Seriousness of the violation;

(b) Harm caused by the violation;

(c) Good faith or lack of good faith of the licensee; and

(d) Licensing history of the licensee.

**4.** It is of interest that the Court in *Pressman v. Barnes*, 209 Md. 544, 121 A.2d 816 (1956) placed a limitation on this principle. It required, in addition, that "it be impracticable to fix standards without destroying the flexibility necessary to enable the administrative officials to carry

They include public health, *see Department of Transportation v. Armacost, supra,* 311 Md. at 73, 532 A.2d at 1060 (1987); zoning, *see Petrushansky v. State,* 182 Md. 164, 174–5, 32 A.2d 696, 700–01 (1943); *Tighe v. Osborne, supra,* 150 Md. at 457, 133 A. at 467; and public safety, *Pressman,* 209 Md. at 555, 121 A.2d at 816.[5]

Nevertheless, this Court has been clear in its holdings: the Court will approve only those "delegations of legislative power to administrative officials where sufficient safeguards are legislatively provided for the guidance of the agency in its administration of the statute." *Armacost,* 311 Md. at 72, 532 A.2d at 1060 (and cases cited therein). This means that the delegations to the administrative agency should be reasonably specific and provide some guidelines for the agency to follow. *Stillman, supra,* 291 Md. at 413, 435 A.2d at 759. In other

---

out the legislative will." *Id.* at 255, 121 A.2d at 822. It is equally interesting to note that there was no issue in that case concerning the City's authority to delegate to its traffic director the power to impose penalties. The ruling by the trial court that a regulation that sought to prescribe minimum fines and establish presumptions as to guilt was invalid was not appealed. *Id.* at 552, 121 A.2d at 820.

5. At issue in *Pressman* was the authority of the City of Baltimore to empower its traffic director to set speed limits in the City and to promulgate administrative regulations related thereto. In upholding the delegation in that case, the Court made clear that it was the subject matter of the delegation that was critical to its determination of the proper standard:

On account of the tremendous growth of traffic and the need for constant supervision of traffic control, it has also become increasingly imperative for city councils in metropolitan centers to delegate to traffic experts a reasonable amount of discretion in their administrative duties. New traffic problems are constantly arising, and therefore to require the enactment of an ordinance to cover each specific problem would be likely to result in widespread delays and even serious hazards. It is obvious that there is a practical necessity for expert and prompt judgment in the application of the concept of public safety to concrete situations, and that the standards for administrative officials in the domain of public safety should be at least as flexible as in the domain of public health.

*Id.* at 553, 121 A.2d at 821. We made clear, however, that whether the regulations were arbitrary or outside the delegation were entirely different issues and that, unless those matters are fairly debatable, the delegations should not withstand judicial review. *Id.*

words, the Legislature must "lay down ... an intelligible principle to which the person or body authorized to [act] is directed to conform." *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928). This principle, said to be its corollary, *see Armacost*, 311 Md. at 77, 532 A.2d at 1062, is thus consistent with, and conformable to, the separation of powers doctrine [6]. That doctrine is constitutional in scope and premised on the belief "that separating the functions of government and assigning the execution of those functions to different branches [is] fundamental to good government and the preservation of civil liberties." *Id.* at 77–78, 532 A.2d at 1062, *citing* M. Vile, *Constitutionalism and the Separation of Powers* (1967).

I am aware that the separation of powers doctrine does not impose, nor insist that there be, in every circumstance, a complete separation between the branches of government. Our cases recognize that there is a certain amount of acceptable overlap between the branches of government. They also recognize, however, that "this constitutional 'elasticity' cannot be stretched to a point where, in effect there no longer exists a separation of governmental power, as the Maryland Constitution does not permit a merger of the three branches of our State government...." *Linchester Sand & Gravel Corp.*, 274 Md. at 220, 334 A.2d at 521.

Consistent with the foregoing, although Maryland's statement of the separation of powers is "a more concrete barrier than any which the Supreme Court has had to hurdle under the Federal Constitution," R. Oppenheimer, *Administrative Law in Maryland*, 2 Md. L.Rev. 185, 188, (1938), the right of the Legislature to delegate powers to administrative agencies has been recognized in this State for more than 125 years. *Harrison v. Mayor & C.C. of Baltimore*, 1 Gill 264 (1843).

---

6. Article 8 of the Maryland Declaration of Rights provides as follows: "That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one said Departments shall assume or discharge the duties of any other."

Thus, as we have held, "delegation of legislative power to the executive branch is constitutionally permissible 'where sufficient safeguards are legislatively provided for the guidance ... in ... administration of the statute.'" *Judy v. Schaefer,* 331 Md. 239, 261, 627 A.2d 1039, 1050 (1993), *citing Armacost,* 311 Md. at 81, 72, 532 A.2d at 1064, 1060. *See also Dep't of Natural Resources v. Linchester Sand & Gravel Corp.,* 274 Md. at 218–220, 334 A.2d at 520–521; *County Council v. Investors Funding Corp.,* 270 Md. 403, 441–442, 312 A.2d 225, 244–246 (1973); *Baltimore v. State,* 15 Md. 376, 459 (1860). Similarly, this Court has made clear, most recently in *Maryland Aggregates v. State,* 337 Md. 658,, 655 A.2d 886 (1995), that

> "[A]n agency in the executive branch may ordinarily perform adjudicatory functions in harmony with the principle of separation of powers provided that there is an opportunity for judicial review of the agency's final determination."

*Id.* at 678, 655 A.2d at 896. *See* also *Attorney General v. Johnson, supra,* 282 Md. at 286–288, 385 A.2d at 64–65; *Shell Oil Co. v. Supervisor* 276 Md. 36, 44–47, 343 A.2d at 526–27 (1975); *County Council v. Investors Funding, supra,* 270 Md. at 432–437, 312 A.2d at 241–243; *State Insurance Comm'r v. Nat'l Bureau of Cas. Underwriters,* 248 Md. 292, 299–301, 236 A.2d 282, 286–287 (1967); *Burke v. Fidelity Trust Co.,* 202 Md. 178, 187–189, 96 A.2d 254, 260 (1953); *Johnstown Coal & Coke Co. v. Dishong,* 198 Md. 467, 473–474, 84 A.2d 847, 850 (1951); *Heaps v. Cobb,* 185 Md. 372, 379, 45 A.2d 73, 76 (1945). The converse is equally true: " 'any attempt to authorize an administrative agency to perform what is deemed a purely *judicial* function or power, would violate the separation of powers principle.'" *Maryland Aggregates,* 337 Md. at 676, 655 A.2d at 895 (quoting *Shell Oil Co. v. Supervisor,* 276 Md. at 47, 343 A.2d at 526–27.)

We have never allowed there to be a delegation to an administrative agency of adjudicatory power without insisting that it be accompanied by provisions for judicial review of the exercise of that power. On the other hand, this Court has never condoned the delegation of legislative power without

first determining that the guidance provided the administrative agency was sufficient to direct its exercise of that power.

The Commission's adoption of a regulation authorizing it to impose a fine on horse owners and related persons in the absence of legislative action permitting it is an impermissible exercise, if not a usurpation, of legislative power by an administrative agency in violation of the separation of powers doctrine. An administrative agency may not impose fines or penalties [7] except with the specific statutory authorization of the Legislature, tempered by prescribed legislative safeguards and standards. *Holy Cross Hosp. v. Health Servs. Cost Review Comm'n, supra,* 283 Md. at 683, 393 A.2d at 184; *Gutwein v. Easton Publishing Co.,* 272 Md. 563, 574-77, 325 A.2d 740, 746-47 (1974); *County Council v. Investors Funding Corp.,* 270 Md. 403, 440-43, 312 A.2d 225, 245-47 (1973). It

---

7. Fines and penalties have been viewed historically as a form of criminal punishment, which can be sanctioned by specific legislative action only. *See* Maryland Code (1957, 1982 Repl.Vol.) Art. 38, § 1. That section provides:

When any fine or penalty is imposed by any act of Assembly of this State or by any ordinance of any incorporated city or town in this State enacted in pursuance of sufficient authority, for the doing of any act forbidden to be done by such act of Assembly or ordinance, or for omitting to do any act required to be done by such act of Assembly or ordinance, the doing of such act or the omission to do such act shall be deemed to be a criminal offense unless the offense is defined as a municipal infraction. Any such offense may be prosecuted by the arrest of the offender for such offense and by holding him to appear in or committing him for trial in the court which has jurisdiction in the said cases and shall proceed to try or dispose of the same in the same manner as other criminal cases may be tried or proceeded with or disposed of, or such offenses may be prosecuted by indictment in such court. If any person shall be adjudged guilty of any such offense by any court having jurisdiction in the premises, he shall be sentenced to the fine or penalty prescribed by such act of Assembly or ordinance and shall be liable for the costs of his prosecution; and in default of payment of the fine or penalty he may be committed to jail in accordance with Sec. 4 of this article until thence discharged by due course of law. Any undischarged fine, and any unpaid costs, may be levied and executed upon as for a judgment in a civil case. Any indictment for the violation of any ordinance of any incorporated city or town of this State may conclude "against the form of the ordinance in such case made and provided and against the peace, government and dignity of the State."

may be authorized to "fill in the details" of laws entrusted to it to administer, but by no means is it permitted to itself promulgate the law. *Insurance Comm'r v. Bankers Indep. Insur. Co.*, 326 Md. 617, 606 A.2d 1072 (1992). In *Bankers*, we put it thusly:

> [A] legislatively delegated power to make rules and regulations is administrative in nature, and it is not and can not be the power to make laws; it is only the power to adopt regulations to carry into effect the will of the legislature as expressed by the statute. Legislation may not be enacted by an administrative agency under the guise of its exercise of the power to make rules and regulations by issuing a rule or regulation which is inconsistent or out of harmony with, or which alters, adds to, extends or enlarges, subverts, impairs, limits, or restricts the act being administered.

326 Md. at 624, 606 A.2d at 1075. *See also Mayor and City Council of Baltimore v. William E. Koons, Inc.* 270 Md. 231, 236–37, 310 A.2d 813, 816–17 (1973) (*quoting* 1 Am.Jur.2d *Administrative Law* § 132 (1962)). Stated differently:

> [E]ssential legislative functions may not be delegated to administrative agencies, and in this sense it is said that administrative agencies have no legislative power and are precluded from legislating in the strict sense. The most pervasive legislative power conferred upon administrative agencies is the power to make rules and regulations and the necessity for vesting administrative agencies with this power because of the impracticability of the lawmakers providing general regulations for various and varying details has been recognized by the courts.

*Id.* at § 92.

I do not quarrel with the Racing Commission's power to regulate racing in this State. There simply can be no doubt that it has that authority. In fact, the enabling legislation applicable to it is explicit in empowering the Racing Commission to "adopt regulations and conditions," consistent with its legislatively prescribed mandate. To enforce those regulations and rules, the Racing Commission is free to revoke,

restrict, or suspend any licenses required for participation in racing in Maryland. Such power may well be incidental to the power to regulate and, thus, fairly implied from it. I do not believe, however, that a provision broadly authorizing "powers necessary or proper to carry out fully all the purposes of this title" permits the Racing Commission to promulgate rules and regulations prescribing that fines and penalties may be assessed and, in the case of specified conduct, their amount. As to that issue the delegation is too broad; it provides absolutely no standard or guidance to focus and direct the power assumed.[8]

The Maryland General Assembly is well aware of how to empower administrative agencies to impose fines. Examples of its having done so can be found throughout the Maryland Code. The agencies to which such power has been given include one with duties and responsibilities similar to and reminiscent of the Racing Commission, the State Athletic Commission, *see* Maryland Code (1992, 1996 Cum.Supp.) § 4-

---

**8.** Indeed, in this case, the Commission has assumed the power to fine. Moreover, it has also determined whether to fine, whom to fine, under what circumstances, and the amount of the fine, all without any Legislative authority whatsoever. The majority asserts that the loss of this power would render ineffective the Commission's ability to regulate racing. That simply is not so. To the extent that power beyond that which directly impacts licensure is necessary, the Racing Commission is free to go back to the source of its creation—the General Assembly— and request it. Then, because the delegation must be accompanied by guidelines and standards, *see Christ v. Department of Natural Resources*, 335 Md. 427, 441, 644 A.2d 34, 40 (1994)("[u]nder our cases, delegations of .legislative power to executive branch agencies or officials ordinarily do not violate the constitutional separation of powers requirement as long as guidelines or safeguards, sufficient under the circumstances, are contained in the pertinent statute or statutes."), *see* also *Judy v. ·Schaefer, supra,* 331 Md. at 263, 627 A.2d at 1051; *Maryland State Police v. Warwick, supra,* 330 Md. at 480–481, 624 A.2d at 1241; *Department of Transportation v. Armacost,* 311 Md. 64, 72, 532 A.2d 1056, 1060 (emphasis supplied), the application of the power will be subject to review for arbitrariness and capriciousness. *Baltimore Import Car v. Maryland Port Auth.,* 258 Md. 335, 342, 265 A.2d 866, 870 (1970); *Gaywood Community Ass'n v. MTA,* 246 Md. 93, 98, 227 A.2d 735, 739, (1966); *Gonzales v. Ghingher,* 218 Md. 132, 136, 145 A.2d 769, 772 (1958); *Maryland Theatrical Corp. v. Brennan,* 180 Md. 377, 380, 24 A.2d 911, 914 (1942).

310(a)(2) [9] of the Business Regulation Article (hereinafter "BR"); the Maryland Home Improvement Commission, *see* BR § 8–620 [10]; the State Board of Veterinary Medical Examiners, *see* Maryland Code (1974, 1985 Replacement Volume), § 2–310.1 [11] of the Agriculture Article; the Maryland Commission on Real Estate Brokers, *see* Maryland Code (1989, 1995 Replacement Volume, 1996 Cum.Supp.) § 17–322 [12] of the Business Occupations and Professions Article; the State Board of Dental Examiners, *see* Maryland Code (1981, 1994 Replacement Volume) § 4–317(a) [13] of the Health Occupations Article ("HO"); the Workers' Compensation Commission, *see* Maryland Code (1991) § 9–664(a) [14] of the Labor and Employ-

---

9. That section states:

    Instead of or in addition to suspending or revoking a license under this subsection, the Commission may impose a penalty of up to $2,000 for each violation.

10. That section provides, in relevant part:

    (a) In general.—The Commission may impose on a person who violates this title a civil penalty not exceeding $5,00 for each violation, whether or not the person is licensed under this title.

11. That section provides:

    (a) Penalty in lieu of or in addition to suspension.—In lieu of or in addition to suspension of the license, the Board may impose a penalty of not more than $5,000.

    (b) Penalty in addition to revocation.—In addition to revocation of the license, the Board may impose a penalty of not more than $5,000.

12. As relevant, that section reads:

    (c) Penalty.—(1) Instead of or in addition to suspending or revoking a license, the Commission may impose a penalty not exceeding $2,000 for each violation.

13. That section provides:

    (a) Imposition of penalty.—If after a hearing under § 4–318 of this subtitle the Board finds that there are grounds under § 4–315 of this subtitle to suspend or revoke a general license to practice dentistry, a limited license to practice dentistry, or a teacher's license to practice dentistry, or to reprimand a licensed dentist, the Board may impose a penalty not exceeding $5,000:

    (1) Instead of suspending the license; or
    (2) In addition to suspending or revoking the license or reprimanding the licensee.

14. That section provides:

ment Article; the Insurance Commissioner, *see* Article 48A, § 55A [15]; the Commissioner of Labor and Industry, *see, e.g.* BR §§ 9–310(b) [16] and 9–408(d) [17]. In some cases, the General Assembly has provided, in addition to the power to fine, guidelines and standards to focus that power. *E.G.*, BR § 8–620(b) [18] and Business Occup. § 17–322(c)(2) [19]. The preceding

---

(a) Fine.—(1) If the Commission finds that the employer or its insurer has failed, without good cause, to pay for treatment or services required by § 9–660 of this Part IX of this subtitle within 45 days after the Commission, by order, finally approves the fee or charge for the treatment or services, the Commission may impose a fine on the employer or insurer, not exceeding 20% of the amount of the approved fee or charge.
(2) The employer or insurer shall pay the fine to the Commission to be deposited in the General Fund of the State.

15. In that section, the General Assembly has provided that "[i]n lieu of or in addition to revocation or suspension of an insurer's certificate of authority the Commissioner may (1) impose a penalty of not less than one hundred dollars ($100) or more than fifty thousand dollars ($50,000) for each violation of this article on any insurer whose certificate of authority is subject to revocation or suspension under the provision of this article...."

Effective October 1, 1997, this provision will be codified in a new Insurance Article. *See* ch. 11, Acts of 1996.

16. That section provides:
(b) Penalty instead of revocation or suspension.—Instead of revoking or suspending a license, the Commissioner may impose a penalty of not less than $25 and not more than $500.

17. That section provides:
(d) Penalty instead of revocation or suspension.—Instead of revoking or suspending a license, the Commissioner may impose a penalty of not less than $25 and not more than $500.

18. (b) *Considerations.*—In setting the amount of a civil penalty, the Commission shall consider:
(1) the seriousness of the violation;
(2) the good faith of the violator;
(3) any previous violations;
(4) the harmful effect of the violation on the complainant, the public, and the business of home improvement;
(5) the assets of the violator; and
(6) any other relevant factors.

19. (2) To determine the amount of the penalty imposed under this subsection, the Commission shall consider:

catalogue is by no means exhaustive. Suffice it to say, however, that the list of omitted agencies, those not mentioned here, does not include the Racing Commission.

That the Legislature, in so many instances, has expressly prescribed the power of administrative agencies to fine speaks volumes with regard to its intention in this case. When it has wanted to authorize an agency to fine or impose a monetary penalty, it has clearly and explicitly said so. A broad delegation of authority simply does not suffice. The Attorney General has expressed just this view in a different, but related context. *See* 66 *Op. Att'y. Gen.* 197 (1981). Recognizing that the power to impose fines could be implied from the broad language of a statute of a local jurisdiction, the Attorney General nevertheless concluded that the statute was invalid. He opined that the power to impose a fine, penalty or forfeiture—either civil or criminal—"cannot ... be implied but, rather, depends on an express grant from the General Assembly." *Id.* at 203. As I have demonstrated, this is consistent with the practice of the General Assembly. It is also consistent with our cases.

This Court has held previously that, under some circumstances, the Legislature must grant express authority in order for agencies legitimately to act. *Mossburg v. Montgomery County*, 329 Md. 494, 620 A.2d 886 (1993). In *Mossburg*, this Court, speaking through the author of the majority opinion, noted the instances in which supermajority requirements had been upheld, concluding that "where the General Assembly has intended to authorize a supermajority requirement, it has done so expressly." *Id.* at 505, 620 A.2d at 892. We also made clear that such a requirement "should not be implied from a general authorization to adopt rules and regulations." *Id.* at 508, 620 A.2d at 893. *See* also *Office & Professional Employees Int'l Union, Local 2 v. Mass Transit Admin.*, 295

---

(i) the seriousness of the violation;
(ii) the harm caused by the violation;
(iii) the good faith of the licensee; and
(iv) any history of previous violations by the licensee.

Md. 88, 97, 453 A.2d 1191, 1195 (1982) (stating that "absent express legislative authority," a governmental agency cannot enter into binding arbitration or binding collective bargaining agreements establishing wages, hours, pension rights, or working conditions for public employees).

The majority has not cited even one case in which it was held, under circumstances similar to those *sub judice,* where there is no legislative direction on the subject, that an administrative agency may promulgate a rule or regulation imposing a fine or penalty. It relies, instead, on the broad delegation of authority given the Racing Commission, the Commission's power to promulgate rules and regulations, and the majority's conclusion that "the regulation authorizing the imposition of a fine is entirely in accord with the statutory purpose." 343 Md. 681, 689, 684 A.2d 804, 808 (1996). The majority cites *Christ v. Department of Natural Resources,* 335 Md. 427, 644 A.2d 34 (1994), in support of the first two propositions. The power of the Department of Natural Resources to impose fines for violations of its regulations was not at issue in that case, only whether the regulation that was the subject of appeal was authorized by the enabling legislation pursuant to which it was adopted. That this is so is demonstrated by the very passage from *Christ* quoted by the majority:

> In the State Boat Act, . . . the General Assembly broadly granted to the Department the authority to adopt *regulations* governing the "operations of any vessels" which are subject to the Act. In numerous situations where the General Assembly has delegated similar broad power to an administrative agency to *adopt legislative rules or regulations* in a particular area, this Court has upheld the agency's rules or regulations as long as they did not contradict the language or purpose of the statute.

343 Md. at 688, 684 A.2d at 807 (quoting *Christ v. Department of Natural Resources,* 335 Md. at 437, 644 A.2d at 39) (*Emphasis added* ).

I agree with the result reached in *Christ.* A statute permitting the Department of Natural Resources to "adopt regula-

tions necessary to carry out the provisions of this subtitle," specifically "regulations governing . . . operations of any vessels subject to this subtitle so that each vessel complying with the regulations may be operated with equal freedom or under similar requirements on all waters of the State," Maryland Code (1974, 1990 Repl.Vol., 1993 Cum.Supp.) § 8–704(b–1)(1) of the Natural Resources Article, does authorize a regulation prohibiting a 14 year old from operating certain types of watercraft. I would have viewed the matter quite differently had the regulation been one fining the 14 year old for operating the prohibited watercraft. Such a regulation would have been unauthorized in the absence of a statutory provision permitting the imposition of a fine.

The other cases cited by the majority also stand for the proposition, and only that proposition, that the Racing Commission has broad authority to promulgate rules and regulations governing racing in Maryland; as the majority opinion itself makes clear, see 343 Md. at 698–699, 684 A.2d at 812–813, none was concerned with the Commission's power to impose fines.

With respect to the latter proposition, that the imposition of a fine may be in accord with the legislative purpose does not answer the pertinent question. Consistency with the legislative purpose is not synonymous with being authorized by the Legislature. Nor is the power to regulate identical to the power to fine. In other words, an unauthorized act may be nevertheless consistent with the purpose for which a statute was enacted. In effect, therefore, the majority merely assumes the issue in controversy; it simply never directly addresses the principles, proffered by the petitioner, applicable to the resolution of that issue.

The majority takes comfort in "the history, nature and rationale of the regulatory scheme governing horse racing in this State, as well as actions by the General Assembly and opinions by this Court," which it maintains "confirm the validity of the [subject] regulation." 343 Md. at 690, 684 A.2d at 808. The comfort is not justified.

Of critical importance to the majority's argument is an Attorney General's opinion issued in 1921, 6 *Op. Att'y Gen.* 480. Issued against the backdrop of the enactment in 1920 of Ch. 273 of the Acts of 1920, which directly addressed, in some detail, the licensure and regulation of "[a]ny person or persons, association or corporation desiring to conduct racing within the State of Maryland," but was silent as to its applicability to racehorse owners, trainers, jockeys, etc., the Attorney General concluded that the statute nevertheless applied to the latter persons. I do not share the majority's view that this opinion makes clear that the Legislature intended the Racing Commission's regulatory power to be all-encompassing. All this opinion does and, therefore, the most the Legislature can be said to have acquiesced in, is to indicate that the Commission's regulatory powers extend to persons critical to the racing industry; it simply does not address whether it has the authority to fine. Indeed, so broad an interpretation of the Attorney General's opinion is to accord to the Racing Commission unlimited power, *i.e.* whatever it takes, including legislating, to accomplish the purpose for which it was created.

Premised on the 1921 Attorney General's opinion and the statutory provisions applicable to racetrack owners, the Commission, since 1921, has promulgated regulations, including the power to fine, paralleling those provisions, but applicable to racehorse owners, trainers, jockeys, etc. The majority relies on this "long and consistent administrative construction of the statute," which has not been disturbed by the General Assembly, as support for its position. As previously indicated, I do not quarrel with the regulations insofar as they apply to licensure. Thus, administrative construction and Legislative acquiescence to that extent may be appropriate, even if not properly before this Court. With regard to the ability of the Commission to impose fines, however, an entirely different situation is presented.[20] There is nothing ambiguous about

---

**20.** It should be recalled that the 1921 Attorney General's opinion did not concern the Commission's authority to impose fines, nor, contrary to the suggestion in the majority opinion, 343 Md. 681, 697–700, 684

the statute; as to owners, trainers, jockeys, etc., it does not authorize the Commission to impose fines. That power is given the Commission only in the case of track owners. "When statutory language is unambiguous, administrative constructions, no matter how well entrenched, are not given weight." *Falik v. Prince George's Hospital,* 322 Md. 409, 416, 588 A.2d 324, 327 (1991). *Macke Co. v. Comptroller,* 302 Md. 18, 22–23, 485 A.2d 254, 256 (1984). Nor, for the same reason, is Legislative acquiescence.

The majority maintains that the cases relied upon by the petitioner do not stand for the proposition for which they were cited. I do not agree. On the contrary, they very specifically and persuasively demonstrate that administrative agencies require authorization from the Legislature to impose a fine or a penalty and that a mere general authorization will not suffice.

In *Gutwein v. Easton Publishing Co.,* 272 Md. 563, 325 A.2d 740, the Maryland Commission on Human Relations, having found employment discrimination, awarded compensatory

---

A.2d 804, 812–813 (1996), has this Court or any other appellate court in this State been presented with that issue. In *Jacobson v. Maryland Racing Commission,* 261 Md. 180, 274 A.2d 102 (1971), the only issue before the Court was the validity of a regulation prohibiting the sale of a horse for a specific period of time. The Commission's authority to fine was specifically and intentionally not challenged in that case; as the appellant said in his brief, "[n]or is any question presented as to the . . . imposition of a money fine." Appellant's Brief at 2–3. Consequently, the fact that the Court commented, in concluding its opinion, "that this State acquired sufficient personal jurisdiction over [Jacobson] in matters of licensed racing to permit it to enjoin him by Rule 80 from selling a horse claimed in a licensed Maryland race for sixty days, and to punish him if he disobeyed that rule," *id.* at 190, 274 A.2d at 103, is neither dispositive nor persuasive. Certainly, it is at best an extremely slender reed on which to base so important a proposition.

To be sure, therefore, the Commission's power to impose fines has not been challenged during the entire time that the Commission has exercised that power. In anticipation of an argument based on that premise, please note that this Court has observed: "[T]he mere fact that no one has thought it worth the trouble or expense to contest the Act in the courts until now [in that case, 40 years] does not detract from the right of the appellant to do so." *Maryland Theatrical Corp. v. Brennan,* 180 Md. 377, 388, 24 A.2d 911, 916 (1942).

damages to the complainant.[21]   Although the Commission was statutorily charged by the Legislature "to promote in *every way possible* the betterment of human relations," and was specifically empowered "to take such affirmative action as will effectuate the purposes of the particular subtitle," *id.* at 564, 325 A.2d at 741 (emphasis added), this Court held that the Commission acted "plainly beyond its power and jurisdiction," there being no express authorization to make monetary awards.

In the same vein, this Court held that a statutory grant of "full power to review and approve the reasonableness of hospital rates" did not empower the Maryland Health Services Cost Review Commission to review and set certain physician charges billed to hospital patients. *Holy Cross Hospital,* 283 Md. 677, 679, 682–83, 687, 690, 393 A.2d 181, 182, 183–85, 186, 187.   And in *Investors Funding Corp.,* 270 Md. at 442, 312 A.2d at 246, where a county agency was properly cloaked with specific authority to impose a monetary penalty up to a specified amount, this Court held that delegation of power, otherwise permissible, unconstitutional due to the "complete lack of any legislative safeguards or standards."   Without safeguards and standards governing its exercise, the agency's discretion to fix the penalties up to the specified ceiling, we noted, would be unlimited.

Cases from other jurisdictions are to like effect.   *See, e.g., Groves v. Modified Retirement Plan et. al.,* 803 F.2d 109, 117 (3rd Cir.1986) (". . . while an administrative agency has wide discretion in deciding how to implement remedial legislation, *see L. P. Steuart & Bros. v. Bowles,* 322 U.S. 398, 64 S.Ct. 1097, 88 L.Ed. 1350 (1944), it may decide to penalize specific kinds of conduct only when [the Legislature] has expressly delegated that power to the agency"); *In re Fayetteville Hotel Assocs.,* 117 N.C.App. 285, 450 S.E.2d 568, 570 (1994) (The power to impose sanctions requires specific legislative authori-

---

**21.**  Although not given the power to fine, the Commission on Human Relations has been authorized, explicitly, to grant monetary relief. Maryland Code (1957, 1994 Replacement Volume) Article 49B, § 11(e).

ty and without such authority, the power to impose sanctions "exceed[s] the Commission's general rulemaking authority"); *Continental Construction Co. v. Board of Trustees of the Internal Improvement Trust Fund,* 464 So.2d 204, 205 (Fla. App.1985) ("... assessment of the penalty is erroneous because the Board has not been legislatively delegated the power to impose penalties ... in the absence of specific legislative authorization"); *State of Florida Dep't of Environmental Regulation v. Puckett Oil Co., Inc.,* 577 So.2d 988, 993, (Fla.App.1991) ("... [the] law is clear that an agency's authority to impose sanction must be expressly delegated to the agency"); *Division of Administrative Hearings v. Department of Transportation,* 534 So.2d 1219, 1220 (Fla.App.1988) (agency without necessary legislative authority to adopt rule allowing hearing officer to impose sanction); *People v. Harter Packing Co.,* 160 Cal.App.2d 464, 325 P.2d 519, 521 (1958) ("If the act under which the administrative agency gets its powers provides no sanctions or penalties for failure to comply, the agency may not by rule promulgate them."); *Columbus Wine Co. v. Sheffield,* 83 Ga.App. 593, 64 S.E.2d 356, 362 (1951) (agency could not, by regulation, make penal something not made penal under the law itself, but could only enforce regulation by suspension or cancellation of license).

It is a fundamental principle of our system of government that "the rights of men are to be determined by the law itself, and not by the let or leave of administrative agencies," 1 Am.Jur.2d *Administrative Law* § 108 (1992). *See also Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 213–214, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668, 688 (1976) ("The rulemaking power granted to an administrative agency is not the power to make law") and *Commission on Med. Discipline v. Stillman, supra,* 291 Md. at 413, 435 A.2d at 759, *citing Gino's v. Baltimore City,* 250 Md. 621, 640, 244 A.2d 218, 229 (1968), in which this Court stated:

> "When legislative power is *delegated* to administrative officials it is constitutionally required that adequate guides and standards be established by the delegating legislative body so that the administrative officials, appointed by the execu-

tive and not elected by the people, *will not legislate,* but will find and apply facts in a particular case in accordance with the policy established by the legislative body." (*Emphasis in original.*)

Therefore, "[t]he exercise of undefined general power legislative in character must be denied" to administrative agencies, 1 Am.Jur.2d *Administrative Law* § 108, for "[a] statute ... which in effect reposes an absolute, unregulated, and undefined discretion in an administrative agency bestows arbitrary powers and is an unlawful delegation of legislative powers." *Id.*